Opinion issued November 10, 2010.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00017-CV

———————————

Ronald Engh, Appellant

V.

Michael
Reardon, M.D. and Panagiotis Kougias, M.D., Appellees



 



 

On Appeal from the 125th District Court

Harris County, Texas



Trial Court Case No. 2008-00133

 



 

MEMORANDUM OPINION

This appeal arises from medical
malpractice claims brought by appellant, Ronald Engh, against appellees, Dr. Panagiotis Kougias and Dr. Michael Reardon.  The trial court dismissed Engh’s claims
against both doctors with prejudice after concluding that the expert report
served by Engh did not satisfy the requirements of section 74.351 of the Texas
Civil Practice and Remedies Code.[1]  This
appeal followed.  

We reverse the judgment of the
trial court.

Background

Engh presented to Methodist Hospital in Houston, Texas with a
history of bilateral extremity deep vein thrombosis and true vena cava
thrombosis.  His course of treatment
included a femorocaval bypass performed by Dr. Kougias and Dr. Reardon on March 23, 2006.  Engh alleges that a surgical clip was placed
on his right ureter during that operation and that the doctors failed to remove
the clip prior to closing.[2]  Drs. Reardon and Kougias, however, claim that
there is no evidence that Engh’s ureter was actually clipped during the
procedure.  According to the doctors,
surgical clips were purposefully placed on blood vessels adjacent to the ureter.  

It is undisputed that in the weeks and months following the
surgery, Engh’s right kidney began to fail. 
Engh was discharged from the hospital to skilled nursing care on May 5,
2006.  Later that same day, Engh was
admitted to another hospital for right hydronephrosis[3] of unknown cause.  On May 24, 2006, another doctor, Dr. David
Ho, unsuccessfully attempted to insert a stent through Engh’s right ureter but
encountered an obstruction.  According to
Dr. Ho’s operative report, the “severe obstruction” was due to “a clip
interpositioned at that location.”  The
operative report also refers to a fluoroscopy of the obstructed area that
identified “multiple surgical clips.” 
The following day, radiologist Dr. George Soltes examined Engh and found
“hydronephrosis and hydroureter with occlusion of the ureter at the L4 level
secondary to a surgical clip.”  A renal
scan taken at the time also showed a “minimally functioning right kidney.”  These attempts to save the kidney, however,
were unsuccessful, and Engh’s right kidney was removed some months later.  

On January 2, 2008, Engh filed
medical malpractice claims against Dr. Kougias, Dr. Reardon, and three other
defendants.[4]  Engh subsequently served the defendants with
a timely expert report authored by Dr. Michael Verta, a board certified
vascular surgeon.  Drs. Kougias and
Reardon timely objected to the sufficiency of the report on February 18,
2008.  After Engh’s 120-day expert report
deadline expired on May 1, 2008, Drs. Kougias and Reardon filed separate
motions to dismiss Engh’s claims for failure to comply with the requirements of
section 74.351.  See Tex. Civ. Prac. & Rem. Code Ann. § 74.351
(Vernon Supp. 2010).  Later that month, the trial court ruled that
Dr. Verta’s expert report was deficient, but granted Engh thirty days to cure
the deficiency.  

Engh timely served an amended
expert report; Drs. Kougias and Reardon responded by filing separate motions to
dismiss pursuant to section 74.351(b) based upon alleged deficiencies with
respect to the amended report.  On August
11, 2009, following a hearing on the doctors’ motions to dismiss, the court
granted the motions and dismissed Engh’s claims against Drs. Kougias and
Reardon with prejudice.  In its order,
the court stated that “[t]he amount of attorney’s fees and costs to be awarded
pursuant to Tex. Civ. Prac. & Rem. Code Sec. 74.351(b) will be determined
at a hearing to be set by defendants at a later date.” 

Four days later, Engh filed a
motion for reconsideration, and in the alternative, Request for Findings of
Fact and Conclusions of Law regarding the trial court’s August 11, 2008
order.  Nearly two months later, on
October 17, 2008, the trial court heard argument on Engh’s motion and took the
matter under advisement.[5]  On October 27, 2008, Engh filed a notice of
appeal seeking review of the August 11, 2008 order.  That appeal was docketed in this Court as an
interlocutory appeal under appellate cause number 01-08-00895-CV.  

Pursuant to the trial court’s
August 2008 order, a hearing was held on December 22, 2008 in order to
determine the amount of attorney’s fees and costs to be awarded.  After the hearing, the court issued an order
granting Dr. Kougias $100,000 and Dr. Reardon $56,000 in attorney’s fees and
costs.[6]  On December 30, 2008, Engh filed a notice of
appeal of the trial court’s December order. 
That appeal was docketed in this Court as a separate and independent
interlocutory appeal under appellate cause number 01-09-0017-CV. 

Engh subsequently motioned the
trial court for an order severing the claims pending against the remaining defendants into a separate cause number (trial court
cause number 2008-00133-A).  The trial
court granted Engh’s request and entered an order severing the remaining claims
on May 5, 2010.  Accordingly, Engh’s
October and December 2008 notices of appeal effectively merged into one notice
of appeal that was deemed filed on May 5, 2010 in appellate cause number 01-09-0017-CV.  See Tex. R. App. P. 27.1(a) (stating premature notice of appeal is “deemed filed on date
of, but after, the event that begins the period for perfecting the appeal”).

Engh presents four issues on appeal, which we will address in
the following order:

1.    
Whether the trial
court abused its discretion by granting Dr. Kougias’s and Dr. Reardon’s motions
to dismiss;

2.    
Whether the fact
that Engh’s expert report substantiates his common law claim of negligence
against Drs. Reardon and Kougias under the doctrine of res ipsa loquitur, codified as section 74.201 of the Texas
Civil Practice and Remedies Code, relieves him of his obligations under section
74.351;

3.    
Whether the trial
court’s dismissal of Engh’s Chapter 74 claims violates his federal
constitutional rights to procedural due process and equal protection under the
law; and 

4.    
Whether the trial
court’s awarding of attorney’s fees under section 74.351(b)(1) of the Texas Civil
Practice and Remedies Code violates Engh’s constitutional right to procedural
due process.

Discussion

In his first issue, Engh contends that the trial court abused
its discretion when it found that Dr. Verta’s report did not satisfy the
requirements of Chapter 74 and granted Dr.
Kougias’s and Dr. Reardon’s motions to dismiss.  Drs. Reardon
and Kougias, however, contend that the trial court did not abuse its discretion
when it dismissed Engh’s claims for failure to satisfy the procedural
requirements of Chapter 74 because Dr. Verta’s report was insuffient with
regard to all three critical elements: standard of care, breach, and causation.  In addition to these insufficiencies, both doctors also contend that dismissal was proper
because Dr. Verta was not qualified to opine on causation.[7]    

I.                 
Standard of Review

We review a trial court’s decision regarding the adequacy of
a section 74.351 expert report under an abuse of discretion standard.  Am. Transitional Care Centers v. Palacios,
46 S.W.3d 873, 877 (Tex. 2001).  We also
apply this same standard when reviewing a trial court’s decision regarding
whether a witness qualifies as an expert for purposes of authoring such a
report.  Larson v. Downing, 197 S.W.3d 303, 304–05 (Tex. 2006) (per curiam);
Moore v. Gatica, 269
S.W.3d 134, 139 (Tex. App.—Fort Worth 2008, pet. denied).  A trial court abuses its discretion if it
acts in an arbitrary or unreasonable manner or without reference to any guiding
rules or principles.  See Walker
v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003).  When reviewing matters committed to the trial
court’s discretion, we may not substitute our own judgment
for that of the trial court.  Walker
v. Packer, 827 S.W.2d 833, 839 (Tex. 1992). 
A trial court does not abuse its discretion simply because it may decide
a matter within its discretion differently than an appellate court.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 242 (Tex. 1985); Larson, 197 S.W.3d at 304 (“Whether to exclude [the expert’s] testimony is a close call on this record. 
Close calls must go to the trial court.”)  A clear failure by the
trial court to analyze or apply the law correctly, however, will constitute an
abuse of discretion.  Packer, 827
S.W.2d at 840.

In reviewing the adequacy of a section 74.351 expert report,
we must evaluate whether the report “represents a good-faith effort” to comply
with the statute.  Strom v. Mem’l
Hermann Hosp. Sys., 110 S.W.3d 216, 221 (Tex. App.—Houston [1st Dist.]
2003, pet. denied).  Although the report
need not marshal all of plaintiff’s proof in order to constitute a “good-faith
effort,” it must include a “fair summary” of the expert’s opinions on the three
statutory elements—standard of care, breach, and causation.  See Palacios, 46 S.W.3d at 878, 880;
Spitzer v. Berry, 247 S.W.3d 747, 750 (Tex. App.—Tyler 2008, pet. denied)
(quoting Palacios, 46 S.W.3d at 880) (stating “fair summary” is
“something less than a full statement” of applicable standard of care, how it
was breached, and how that breach caused plaintiff’s injury).  

In detailing these elements, the report must provide
enough information to fulfill two purposes if it is to constitute a good-faith
effort.  Palacios, 46 S.W.3d at
879.  First, the report must inform the
defendant of the specific conduct that the plaintiff has called into
question.  Id.  Second, the report must provide a basis for
the trial court to conclude that the claims have merit.  Id. 
A report that merely states the expert’s conclusions as to the standard
of care, breach, and causation does not fulfill these two purposes.  Id. 
The expert must explain the basis for his statements and link his
conclusions to the facts.  Bowie Mem’l Hosp. v. Wright, 79
S.W.3d 48, 52 (Tex. 2002).  Further, in
assessing the report’s sufficiency, the court may not draw any inferences, and
instead must rely exclusively on the information contained within the four
corners of the document and the expert’s curriculum vitae.  See id.; Palacios, 46 S.W.3d at 878.        

In the present case, the trial court did not prepare
any findings of fact or conclusions of law, nor did it specify which ground it
was relying upon when it ordered the dismissal of Engh’s petition.  See In re W.E.R., 669 S.W.2d 716, 716
(Tex. 1984).  In such cases, the judgment of the trial court implies all
necessary fact findings in support of the judgment and we will affirm the judgment if it can be upheld on any legal
theory that finds support in the evidence.  See id. at
717.  Accordingly,
we must affirm the trial court’s order on any ground that could have provided
the trial court with a reasonable basis to conclude that Engh’s expert’s report
did not meet the statutory requirements of Chapter 74 (i.e., the report was not authored by a qualified expert or failed
to include a
“fair summary” of the expert’s opinions on standard
of care, breach, or causation), so long as that theory is supported by the
evidence. 


II.              
Expert Qualifications

Both Dr. Reardon and Dr. Kougias argue that the trial court
did not abuse its discretion when it dismissed Engh’s claims against them
because Engh’s expert, Dr. Verta, is not qualified to opine on the issue of
causation.  Specifically, Dr. Reardon and
Dr. Kougias contend that, as a vascular surgeon, Dr. Verta is not qualified—nor
does he claim to be qualified—to opine with regard to the cause of Engh’s renal
failure and the eventual loss of his kidney. 


A person is qualified to opine on the causal relationship
between the damages claimed and the alleged departure from the applicable
standard of care in a section 74.351 expert report only if that person is a
physician and is otherwise qualified to render opinions on that causal
relationship under the Texas Rules of Evidence. 
Tex. Civ. Prac. & Rem. Code
Ann. § 74.351(r)(5)(C).  To be qualified under the Texas Rules of
Evidence, an expert must have knowledge, skill, experience, training, or
education regarding the specific issue before the court that would qualify the
expert to give an opinion on that particular subject, and the expert’s
testimony must be able to assist the trier of fact in understanding that
issue.  Broders v. Heise, 924
S.W.2d 148, 152–53 (Tex. 1996).  Whether an expert is
qualified to opine on a given issue, however, is not dependent upon the
expert’s area of practice, but rather the expert’s familiarity with the issues
involved in the claim before the court.  See id. at 154. 
An expert’s qualifications must appear within the expert report and cannot be inferred.  See Palacios, 46 S.W.3d at 878; see
also Baylor Coll. of Med. v. Pokluda, 283 S.W.3d 110, 117 (Tex.
App.—Houston [14th Dist.] 2009, no pet.). 
Accordingly, analysis of section 74.351 expert qualifications is limited to the four corners of
the expert’s report and the expert’s curriculum
vitae.  Pokluda, 283 S.W.3d at
117. 

Dr. Verta states in his report, in pertinent part: “By virtue
of my education, training, and experience I am qualified to render opinions
regarding the standard of care of the comprehensive vascular surgical treatment
of deep vein thrombosis and vena cava thrombosis and its complications as well
as the cause of those complications.”[8]  According to Dr. Verta, Engh presented to
Methodist Hospital with a history of bilateral extremity deep vein thrombosis
and true vena cava thrombosis.  Engh’s
course of treatment included a March 2006 femorovaval bypass performed by
vascular surgeons, Dr. Kougias and Dr.
Reardon.  Based upon his review of
Engh’s medical records, Dr. Verta concluded that Engh’s ureter was clipped
during that femorocaval bypass surgery. 
Dr. Verta also professes to have knowledge regarding the treatment of
such ureteral ligations and the medical consequences that flow from them,
including hydronephrosis and kidney loss.  Specifically, Dr. Verta states:

The
consequences of ligation or clipping of the ureter are well-known and entirely
predictable, namely, the development of hydronephrosis, the loss of kidney
function on that side because of the ureteral blockage, and a propensity to
develop pyelonephritis because of stagnant urine.  This is exactly what occurred as the result
of Mr. Engh’s clipped ureter.  If the
blockage is not recognized, as it wasn’t in this case, eventual loss of the
kidney is inevitable.  If the condition
is recognized, immediate reconstruction of the ureter is necessary
to preserve function of the kidney and even this may not be entirely successful
if too much time has elapsed between the event and its recognition.

. . . .

If the ureter cannot be reconstructed, then external
drainage of the urine is necessary to preserve kidney function.  This entails the wearing of an appliance for
external delivery and all the consequences attendant to external urinary
diversion, which include dislodgement of the urinary stent with calcareous
deposits, and the need for periodic maintenance of the stent.  

As a vascular surgeon, Dr. Verta is qualified to opine as to the
causation of complications arising from vascular surgical
procedures.  See Livingston v. Montgomery, 279 S.W.3d 868, 873 (Tex. App.—Dallas 2009, no pet.)
(concluding that obstetrician, who was expert in labor and delivery, was
qualified to opine as to causation of complications arising from such medical
procedures, including pediatric neurological injuries).  Moreover, it is apparent from the
four corners of his report that Dr. Verta is knowledgeable regarding the specific issue before
the court—the
consequences of ureteral obstructions—and that his
testimony on this issue would assist the fact finder in understanding the issue
and evaluating the causal connection between the clipping of the ureter and the
injuries suffered by Engh.  Under these
circumstances, it appears as though the trial court would have acted arbitrarily
or in an unreasonable manner if it had concluded that Dr. Verta was not
qualified to opine on causation, and therefore, the trial court would have
abused its discretion if it had dismissed Engh’s claims on this basis.  See Gutierrez, 111 S.W.3d at 62.  The dismissal of Engh’s claims cannot be
affirmed on this ground.

III.          
Standard of Care and Breach

Dr. Reardon
and Dr. Kougias also allege that the trial court did not abuse its discretion when it dismissed
Engh’s claims against them because Dr. Verta’s expert report is insufficient
with regard to the elements of standard of care and breach.  Specifically, both Dr. Reardon and Dr.
Kougias contend that Dr. Verta’s report is inadequate with respect to standard
of care and breach because (1) Dr. Verta impermissibly applies a collective
standard of care to both physicians; (2) Dr. Verta’s opinions with regard to
the applicable standards of care are inaccurate; (3) there is
no factual basis for Dr. Verta’s opinions regarding either standard of care or
breach; and (4) Dr. Verta’s report fails to provide a fair summary of how each physician breached the
standard of care.  Dr. Reardon also contends
that Dr. Verta’s opinion regarding the standard of care applicable to him is
also deficient because it is based upon a theory of vicarious liability that
has been expressly rejected by Texas courts and was not pled in Engh’s amended
petition.

With respect
to the issues of standard of care and causation, Dr. Verta’s report states in
pertinent part:

Standard
of care requires that surgeons, such as Drs. Reardon and Kougias, properly
identify the ureter when performing a femorocaval bypass graft . . . . Standard
of care requires the ureters identification so that it would not be
inadvertently clipped. 

.
. . .

Standard
of care requires that surgeons, such as Drs. Reardon and Kougias, avoid
clipping the ureter during a femorocaval bypass graft.  Clipping the ureter under conditions described
in Dr. Kougias’ Operative Report falls grossly outside standard of care.  There are no circumstances that I can
contemplate that would call for the clipping of the ureter when performing this
procedure.  Surgical clips are designed
to reduce blood flow in veins or arteries, but they are ill-equipped to clamp
the ureter.

Dr. Verta also states that, in addition to their general
obligations as vascular surgeons to identify the ureter and avoid clipping it,
both Dr. Reardon and Dr. Kougias had additional obligations due to their
respective roles in the surgical procedure. 
Specifically, as the lead surgeon, Dr. Reardon was also responsible for
checking any surgical work performed by Dr. Kougias, a surgical resident.  According to Dr. Verta, if Dr. Kougias
breached the standard of care when he clipped the ureter, then Dr. Reardon also
breached the standard of care by failing to adequately monitor Dr. Kougias’s
work, because “that is the standard of care for the lead surgeon working with a
resident in this type of surgery.”  As
the assisting surgical resident, Dr. Kougias also had an obligation to object
to, and even correct, a “glaring deviation” from the standard of care committed
by his senior colleague.  Accordingly, if
Dr. Reardon breached the standard of care when he clipped the ureter, then Dr.
Kougias also breached the standard of care by failing to object to or correct
such a “glaring error.”

Having done so, the report provided Dr. Reardon with a fair
summary of Dr. Vertas’s opinions concerning the applicable standards of care
and how Dr. Reardon failed to meet those standards.  See Palacios, 46 S.W.3d at 880. 
The report also informed Dr. Reardon of the specific conduct that Engh
has called into question—Dr. Reardon’s allowance of the ureter to be clipped
during the femorocaval bypass and to remain clipped either through his actions
(clipping the ureter) or inactions (failing to monitor Dr. Kougias’s work, thus
allowing Dr. Kougias to clip the ureter). 
See id. at 879.  Thus, pursuant to Palacios and its progeny, Dr. Verta’s report is sufficient with
regard to standard of care and breach.

Likewise, Dr. Verta’s report also provided Dr. Kougias with a
fair summary of his opinions concerning the applicable standards of care and
how Dr. Kougias failed to meet those standards. 
See id. at 880.  The report also informed Dr. Kougias of the
specific conduct that Engh has called into question—Dr. Kougias’s allowance of
the ureter to be clipped during the femorocaval bypass and to remain clipped,
either through his actions (clipping the ureter) or inactions (failing to
unclip the ureter after it was clipped). 
See id. at 879.  Thus, pursuant to Palacios and its progeny, Dr. Verta’s report is sufficient with
regard to standard of care and breach.

Nevertheless, Dr. Reardon and Dr. Kougias contend
that Dr. Verta’s report is inadequate as to the standard of care because it
collectively refers to them as a group rather than setting forth individual
standards as to each defendant physician.  The doctors rely upon several cases to support this contention.  See, e.g., Gray
v. CHCA Bayshore, L.P., 189 S.W.3d 855 (Tex. App.—Houston [1st Dist.] 2006,
no pet.); Longino v. Crosswhite, 183
S.W.3d 913 (Tex. App.—Texarkana 2006, no pet.); Taylor
v. Christus Spohn Health Sys. Corp., 169
S.W.3d 241 (Tex. App.—Corpus Christ 2005, no pet.); Doades v. Syed, 94
S.W.3d 664 (Tex. App.—San Antonio 2002, no pet.); Rittmer v. Garza, 65
S.W.3d 718 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  These cases, however, are factually distinguishable
from the present case.[9]  

In Longino, the expert failed to differentiate between the conduct of a
treating emergency room physician and a consulting pediatrician, and provided
no specific information with regard to how the pediatrician breached the
standard of care.  Longino, 183 S.W.3d at 917.  The court of appeals stated that “in the
absence of specific information concerning [the pediatrician’s] conduct and
only conclusory statements concerning causation, the trial court abused its
discretion by finding that the expert report constituted a good-faith effort.”  Id.
at 918.

In Taylor, the
plaintiff filed suit against several defendants, including a hospital, a doctors’ association, an emergency room
physician, and a cardiologist, alleging that her husband’s death was due to the
defendants’ negligence in failing to manage and timely and accurately diagnose
his cardiac condition and in failing to perform tests necessary to diagnose and
recognize his condition.  Taylor,
169 S.W.3d at 242.  The expert in that
case failed to articulate a specific standard of care for each defendant.  See
id. at 243–44.  He also failed to identify what each
individual defendant should have done to meet the standard of care and failed
to do.  See id.  The court of appeals
determined that the trial court did not abuse its discretion when it found the
report insufficient and it affirmed the trial court’s dismissal of the suit.

The claims in Rittmer
involved two separate surgical procedures performed by two different
defendants—an oncologist performing a mastectomy and a plastic surgeon
performing reconstructive surgery.  Rittmer,
65 S.W.3d at 720.  The expert report in Rittmer failed to articulate a specific
standard of care applicable to each defendant, with respect to the performance
of his particular surgical procedure and failed to causally link the conduct of
each defendant to the plaintiff’s injuries. 
Like in Taylor, the court of
appeals in that case determined that the trial court did not abuse its
discretion when it found the report insufficient and it affirmed the trial
court’s dismissal of the suit.  Id.
at 722.  

In Doades, the expert report combined the
standard of care, breach, and causation into a general assertion that that
treating physician and nurse “[failed] to properly monitor Doades and . . .
[failed] to timely identify and properly treat [his] condition,” a statement
the court of appeals deemed conclusory.  Doades, 94 S.W.3d 664, 668, 671–72.  The court of appeals in that case determined
that the report did not constitute a good faith effort to comply with the
statutory requirements because it failed to set forth the standard of care for
each of the defendant and contained mere conclusions regarding breach and
causation.  Id.  Likewise, in Gray, this Court held that the trial court
could have found the identical standards of care articulated for both the
surgeon and the nurses treating the plaintiff as generic statements, which
reasonably could be deemed conclusory and affirmed the trial court’s dismissal
for failure to comply with
section 74.351.  189 S.W.3d at 859.    

In the present case,
Dr. Verta is not attempting to state a collective standard of care applicable
to members of two or more different professions, as was the case in both Gray and Doades, nor is he attempting to state a collective standard of care
applicable to physicians with different specializations, as was the case in Longino, Rittmer, and Taylor.  Here, Dr. Verta’s report comments on the failure
of a uniform duty owed by two vascular surgeons to the same patient with
respect to a single surgical procedure—to identify the ureter
and not clip it.  And, also unlike these
cases, Dr. Verta specifically identifies each defendant’s negligent
actions, and discusses their failures according to the standard of care owed to
Engh.  Furthermore,
Dr. Verta’s report does not contain the type of overly broad, sweeping
statements found to be conclusory in both Gray
and Doades.  

Not only are the cases
relied upon by Drs. Reardon and Kougias factually distinguishable, but the
circumstances of this case are more closely aligned with this Court’s recent
opinion in Rittger v. Danos, which
Engh cited to during oral argument.  No.
01-08-00588-CV, 2009 WL 1688099 (Tex. App.—Houston [1st Dist.] June 18, 2009,
no pet.).  In that case, Dr. Rittger
alleged that the plaintiff’s expert report was insufficient because it
collectively referred to him (an emergency room physician) and another
defendant (an obstetrician) when discussing the applicable standard of
care.  This Court determined that the
report was sufficient as to Dr. Rittger with regard to standard of care and
breach because it articulated a standard of care applicable to him and
described how he breached that standard. 


The doctors also challenge the accuracy of Dr. Verta’s
opinions with respect to standard of care. 
Whether Dr. Verta’s opinions regarding the applicable standards of care
are correct, however, is an issue for summary judgment, not a motion to dismiss
under Chapter 74.  See Methodist Hosp. v. Shepherd-Sherman, 296 S.W.3d 193, 199 n.2 (Tex.
App.—Houston [14th Dist.] 2009, no pet.) (citing Sanjar v. Turner, 252 S.W.3d, 460, 467 n.6 (Tex.
App.—Houston [14th Dist.] 2008, no pet.) (concluding that doctor’s arguments
that he did not owe duty to patient as described in expert report was issue for
summary
judgment rather than motion to dismiss) and Wissa v. Voosen, 243
S.W.3d 165, 169–70 (Tex. App.—San Antonio 2007, pet. denied) (same)).

The doctors also
contend that there is no factual basis for Dr. Verta’s opinions regarding
either standard of care or breach.  According to Drs. Kougias and
Reardon, Dr. Verta’s opinions are based upon an unsubstantiated assumption that
Engh’s ureter was actually clipped during the femorocaval bypass procedure.  In his report, Dr. Verta cites to numerous
places in the Engh’s medical records which clearly indicate that Engh’s ureter
was clipped.  Specifically, Dr. Verta states,
in pertinent part that “[t]he medical records are replete with evidence that
the ureter was clipped.”  Dr. Verta
cites, among other things, a report by Dr. Soltes in which he stated that an
examination of Engh in May 2006 revealed “hydronephrosis and
hydroureter with occlusion of the ureter at the L4 level secondary to a
surgical clip” and an operative report detailing Dr. Ho’s unsuccessful attempt
to insert a stent through Engh’s right ureter on May 24, 2006, which, according
to Dr. Verta, “is concrete evidence that a surgical clip had been
placed on Mr. Engh’s ureter prior to 5/24/2006.”  Dr. Verta also states that in his
professional opinion, the ureter was clipped during the March 23, 2006
femorocaval bypass performed by Drs. Reardon and Kougias because “[t]his is the
only operation that would had led surgeons to encounter Mr. Engh’s ureter and
to clip it.”  Thus, there is a factual
basis for Dr. Verta’s claim that Engh’s ureter was clipped during the
procedure.  Which doctor actually clipped
the ureter, however, is of little consequence at this stage, because Engh’s
negligence claim is premised upon the fact that the ureter was clipped and that
both doctors would be negligent either through their actions (clipping the
ureter) or inactions (failing to discover the clipped ureter and unclip it
prior to closing the incision).

Dr. Reardon also contends that Dr. Verta’s opinion regarding
the standard of care applicable to him is also deficient because it is based
upon a theory of vicarious liability that has been expressly rejected by Texas
courts and was not pled in Engh’s amended petition—the
“captain of the ship”
doctrine.  Dr. Reardon’s arguments, however,
mischaracterize both Dr. Verta’s report and Engh’s allegations.  Neither Engh nor Dr.
Verta is alleging that Dr. Reardon is liable for any negligent acts committed
by Dr. Kougias in the operating room by virtue of the fact that Dr. Reardon was
the lead surgeon.  On the contrary, the
claims against Dr. Reardon are based upon alleged negligent acts or omissions
committed by Dr. Reardon himself. 
Specifically, Engh
asserts in his petition that Dr. Reardon was negligent in allowing the ureter
to be clipped during the procedure and in failing to remove the clip prior to
closing the surgical incision.  Dr.
Verta’s report, which supports Engh’s cause of action for negligence, offers
two possible theories of negligence, based upon
allegations of both action and inaction on Dr. Reardon’s part.  Whether Dr. Verta is correct in holding Dr. Reardon to such
standards of care, however, is an issue for summary judgment, not a motion to
dismiss under Chapter 74.  See Shepherd-Sherman,
296 S.W.3d at 199 n.2.

Under these
circumstances, we conclude that the trial court would have acted arbitrarily or
in an unreasonable manner if it had concluded that Dr. Verta’s report was
insufficient with regard to standard of care or breach, and therefore, the
trial court would have abused its discretion if it had dismissed Engh’s claims
on either basis.  See Gutierrez, 111 S.W.3d at 62. 
The dismissal of Engh’s claims cannot be affirmed on either of these
grounds.

IV.          
Causation

Both Dr. Reardon and Dr. Kougias challenge the sufficiency of
Dr. Verta’s report with regard to the issue of causation.  Specifically, Dr. Kougias alleges that Dr.
Verta’s opinions regarding causation are conclusory and speculative and not
supported by any factual basis.  Dr.
Kougias contends that Dr. Verta’s opinions with regard to the issue of
causation are based upon the unsupported assumptions that Engh’s ureter was
clipped during the surgery, and that the clipping of the ureter caused Engh’s
injuries.  Dr. Kougias also contends that
Dr. Verta does not identify a specific breach of the applicable standard of
care by Dr. Kougias that caused Engh’s injuries (rather than Dr. Kougias and
Dr. Reardon collectively).

Dr. Reardon alleges that Dr. Verta’s report fails to provide
a fair summary of how he caused Engh’s injuries.  According to Dr. Reardon, there is an
analytical gap between the facts alleged in Dr. Verta’s report and Dr. Verta’s
conclusions with regard to the issue of causation.  Dr. Reardon further alleges that Dr. Verta’s
report does not provide the trial court with a basis for concluding that Engh’s claims against him have merit.

As discussed in the previous section, Dr. Verta’s opinions
with regard to standard of care and breach are based upon facts, not mere
speculation, because the medical records in this case provide a factual basis
for Dr. Verta’s claim that Engh’s ureter was clipped during the femorocaval
bypass procedure performed by Drs. Reardon and Kougias.  Dr. Verta also identifies in his report what
each doctor did or failed to do and what they should have done in order to
comply with the applicable standards of care. 
According to Dr. Verta, both doctors are responsible for either the clipping
of the ureter or failing to unclip it prior to closing the surgical incision,
and it was this conduct that set a chain of events in motion that ultimately
caused the loss of Engh’s kidney.  This
is sufficient under section 74.351.  See
Patel v. Williams, 237 S.W.3d 901, 905–06 (Tex. App.—Houston [14th Dist.]
2007, no pet.) (holding expert report sufficiently set forth causation when it presented chain of
events beginning
with contraindicated prescription and ending with patient’s death).

Nevertheless, Dr. Reardon contends that the
trial court would not have abused its discretion if it had found that the
report was insufficient as to causation because the
facts in this case provided ample support for the trial court to find that it
was the action of another party—not Dr. Reardon—that was the substantial factor
in causing Engh’s injury, citing IHS
Cedars Treatment Center v. Mason, 143 S.W.3d 794, 798 (Tex. 2004).  IHS
Cedars Treatment Center, however, does not stand for such a proposition.  In that case, the Supreme Court affirmed the trial
court’s granting of summary judgment in favor of certain health care defendants
because the evidence failed to show a causal connection between each
defendant’s conduct and the plaintiff’s injuries.  Furthermore, IHS Cedars Treatment Center, which involved a summary judgment proceeding, not a
section 74.351 motion to dismiss, does not stand for the proposition that a
section 74.351 expert report must exclude every other possible cause of the
plaintiff’s injury in order to comprise a “good-faith effort” to comply with
the statute.  See Palacios, 46 S.W.3d at 878, 880
(stating report need not marshal all of plaintiff’s proof in order to constitute
“good-faith effort”).  This is particularly
true in light of the fact that a plaintiff—at any stage in a health care
liability suit—is not required to establish causation
in terms of medical certainty, nor is he or she required to
exclude every other reasonable
hypothesis.  Bradley v. Rogers,
879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing King
v. Flamm, 442 S.W.2d 679, 682 (Tex. 1969)).  

Under these
circumstances, we conclude that the trial court would have acted arbitrarily or
in an unreasonable manner if it had concluded that Dr. Verta’s report was
insufficient with regard to causation, and therefore, the trial court would
have abused its discretion if it had dismissed Engh’s claims on this
basis.  See Gutierrez, 111
S.W.3d at 62.  The dismissal of Engh’s
claims cannot be affirmed on this ground.

 

Conclusion 

Having determined that the trial
court would have abused its discretion had it found that Dr. Verta’s report was
insufficient with respect to standard of care, breach, or causation, or
that Dr. Verta was unqualified to opine on the issue of causation, we conclude that the trial court abused its
discretion by granting Dr. Kougias’s and Dr. Reardon’s motions to dismiss.  We grant appellant’s first issue.

Having determined that the trial court abused its discretion
by granting Dr. Kougias’s and Dr. Reardon’s motions to dismiss, we need not
address appellant’s remaining issues.  We reverse the judgment of the
trial court and remand for further proceedings consistent with this opinion.

 

 

                                                                   Jim
Sharp

                                                                   Justice 

 

Panel
consists of Chief Justice Radack and Justices Bland and Sharp.

 

 











[1]           See Tex.
Civ. Prac. & Rem. Code Ann.
§ 74.351 (Vernon Supp. 2010).





[2]           The ureter is a long, narrow duct that
transports urine from a kidney to the urinary bladder.





[3]           Hydronephrosis is
distention (dilation) of the kidney with urine, caused by backward pressure on
the kidney when the flow of urine is obstructed.





[4]           Although Methodist Hospital, Dr. Claudia
Jordan, and Medical Specialists of Texarkana were also named as defendants in
the suit, they are not a party to this appeal. 
Engh dropped his claims against Methodist Hospital.  His claims against Dr. Jordan and Medical
Specialists of Texarkana were severed, given a new cause number, and remain
pending. 





[5]           The trial court denied Engh’s motion for
reconsideration on November 11, 2008.





[6]           Although
the hearing was held on December 22, 2008, the trial court’s order awarding
attorney’s fees and costs was inadvertently dated December 19, 2008.  The date of the order, however, is immaterial
for purposes of this appeal.  As a matter
of convenience, we will use the same date as the trial court.





[7]           Neither
Dr. Reardon nor Dr. Kougias challenge Dr. Verta’s
qualifications with regard to either standard of care or breach.





[8]           Dr. Verta also states that a “uretral  obstruction” is “not a normal or expected
consequent [sic] of femorocaval bypass.” 
Dr. Verta goes on to say that Dr. Reardon’s and Dr. Kougias’s
actions were “so far a field from [the applicable] standard of care, no
subsequent treater would have examined Mr. Engh for the possibility of a
surgical clip being the cause of his ureter obstruction.”





[9]           The
following memorandum opinions cited by Dr. Reardon and/or Dr. Kougias in
support of this proposition are also distinguishable: Haddad v. Marroquin,
Nos. 13-07-014-CV, 13-07-109-CV, 2007 WL 2429183, at *4 (Tex. App.—Corpus
Christi Aug. 29, 2007, pet. denied) (mem. op.) (concluding that in suit
alleging sponge left in patient after surgery, report that failed to set forth
standard of care for either physician or hospital with respect to use and count
of sponges was insufficient); Kuykendall v.
Dragun, M.D., No. 11-05-00230-CV, 2006 WL 728068, at *3 (Tex.
App.—Eastland Mar. 23, 2006, pet. denied) (mem. op.) (concluding that report
that failed to differentiate between conduct of first surgeon who perforated
patient’s bladder during surgery and second surgeon who subsequently repaired
perforation, but was not present for initial surgical procedure, was
insufficient); Boston v. Baylor
College of Med., No. 01-14-00230-CV, 2005 WL 1365505, at *3 (Tex.
App.—Houston [1st Dist.] June 9, 2005, pet. denied) (concluding that report
that stated single standard of care for 10 physicians, without regard to each
physician’s specialization or role in patient’s medical treatment was
insufficient); Talmore v. Baptist Hosps. of Se. Tex., No. 09-06-024-CV,
2006 WL 2883124, at *3 (Tex. App.—Beaumont Oct. 12, 2006, no pet.) (mem. op.)
(concluding that report that set forth one standard of care for orthopedic
surgeon, nephrologist, and infectious disease specialist who treated plaintiff
for different medical conditions was insufficient); Norris v. Tenet
Houston Health Sys., No. 14-04-01029-CV, 2006 WL 1459958, at *3–4 (Tex.
App.—Houston [14th Dist.] May 30, 2006, no pet.) (mem. op.)  (concluding
that report that failed to identify defendant nurses by name or identify how
each nurse breached standard of care and how breach caused injury was
insufficient).