**Kevin RITTGER, M.D., Appellant,**

v.

**Virginia Lou DANOS, Individually and as Next Friend of Ryan Cochran, a Minor, Appellees.**

No. 01–08–00588–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 18, 2009.

Rehearing Overruled July 17, 2009.

Jeffrey H. Uzick, Uzick, Oncken, Scheuerman & Berger, P.C., Houston, TX, for Appellant.

Joshua Paul Davis, Youngdahl & Citti, P.C., Houston, TX, for Appellee.

Panel consists of Justices KEYES, HANKS, and BLAND.

## OPINION

GEORGE C. HANKS, JR., Justice.

In this interlocutory appeal, appellant, Kevin Rittger, M.D., challenges the trial court's order denying his motion to dismiss the medical malpractice claims made against him by appellee, Lou Virginia Danos, individually and as next friend of Ryan Cochran, a minor. In his sole issue, Rittger contends that the trial court erred by not dismissing the suit on the ground that Danos submitted expert reports that did not satisfy the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. We affirm.

## I. Background

On May 30, 2003, Danos, who was 28–weeks pregnant with her second child, went to St. John Hospital's emergency room complaining of right arm numbness. Rittger, the emergency room physician, obtained a CT scan of her head and called for a consultation by Danos's obstetrician, Dr. Victor Patel. Dr. Patel evaluated Danos and ordered a neurological examination. Before the scheduled neurological exam could take place, Patel discharged Danos with a diagnosis of "generalized anxiety." Two days later, Danos went to Memorial Hermann Hospital with weakness of her right upper and lower extremities. Medical Professionals there found that she had experienced a left middle cerebral artery ("MCA") stroke due to a clot at the bifurcation of the left MCA.

Danos sued Rittger and other healthcare providers for medical negligence.[1] Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code,[2] Danos time-

---

1. All defendants except Rittger were eventually nonsuited.

2. Section 74.351(a) provides as follows:
   In a health care liability claim, a claimant shall, not later than the 120th day after the

ly filed expert reports from Dave David, M.D., an obstetrician, and Frank Baker, M.D., an emergency room physician. Dr. David's report did not address the care provided by Rittger. Rittger objected to the sufficiency of Baker's report and moved to dismiss. The trial court ruled that the report did not comply with section 74.351 and gave Danos 30 days to cure the deficiency.[3] Within the 30 days, Danos served a new report from Baker as well as a report from John Meyer, M.D., a neurological expert not previously designated. The trial court found that Baker, although qualified to opine on the standard of care and its breach, failed to show the nexus between the negligence and the injury. The trial court further found that, section 74.351(c) did not permit Danos to serve a report from a new expert. The trial court dismissed Danos's case and awarded Rittger $10,000 in attorney's fees.

Danos appealed the dismissal of her case to this court, and a panel of this court affirmed the judgment of the trial court. *Danos v. Rittger*, 253 S.W.3d 294, 295 (Tex.App.-Houston [1st Dist.] 2007, pet. granted). The Supreme Court reversed, holding that section 74.351(a) allows a claimant to cure a deficiency in a report by serving a report from a separate expert during the 30–day cure period. *Danos v. Rittger*, 253 S.W.3d 215 (Tex.2008). The Supreme Court remanded the case to the trial court to consider the adequacy of Dr. Meyer's expert report. *Id.* at 215–16. Following an oral hearing, the trial court denied Rittger's motion to dismiss, and this interlocutory appeal followed.

On appeal, Rittger reasserts his challenges to the adequacy of the plaintiff's expert reports, claiming that the reports of Baker and Meyer, considered together or separately, fail to satisfy Chapter 74's requirements. Rittger also seeks remand on the issue of attorney's fees.

## II. Medical Expert Reports

### A. Standard of Review

We review all section 74.351 rulings under an abuse of discretion standard. *Am. Transitional Care Centers v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985).

date the original petition was filed, serve on each party or the party's attorney one or more expert report, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.
TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2008).

3. Section 74.351(c) provides: "[i]f an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency." *See id.* § 74.351(c).

Although we may defer to the trial court's factual determinations, we review questions of law de novo. *Rittmer v. Garza*, 65 S.W.3d 718, 722 (Tex.App.-Houston [14th Dist.] 2001, no pet.). To the extent resolution of the issue before the trial court requires interpretation of the statute itself, we apply a de novo standard. *Buck v. Blum*, 130 S.W.3d 285, 290 (Tex. App.-Houston [14th Dist.] 2004, no pet.).

■ In reviewing whether an expert report complies with Chapter 74.351, we evaluate whether the report "represents a good-faith effort" to comply with the statute. *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must look only at the information that is contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex.2002).

## B.  Chapter 74 Expert Report Requirements

Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2008). If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(1). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and

(3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Palacios*, 46 S.W.3d at 877.

■ Although the report need not marshall all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 878; *Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.). In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Palacios*, 46 S.W.3d at 879. Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie*, 79 S.W.3d at 52 (citing *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Palacios*, 46 S.W.3d at 878.

## C.  Adequacy of Experts' Reports

Reading both the Baker and Meyer reports together, we conclude that the documents satisfy all three elements under *Palacios*. Specifically, they identify the standard of care, describe the conduct that allegedly breached that standard, and identified a causal relationship between the alleged breach and Danos's injury.

### 1.  Dr. Baker's Reports

First, we review the adequacy of Dr. Baker's reports as it pertains to the standard of care for Rittger and the breach of that standard. The initial report by Baker collectively addressed the negligence of Rittger and others. Specifically, the report alleged that:

Dr. Rittger and Dr. V. Patel deviated from the standard of care by failing to diagnose TIA [transient ischemic attack] and by failing to admit the patient for further evaluation and treatment of her TIA. That evaluation should have initially consisted of laboratory work such as a CBC with platelet count, prothrombin time, and partial thromboplastin time in an effort to explore hypercoagulabile states, an echocardiogram looking for cardiac sources of emboli, and a carotid Dopplar ultrasound to evaluate the patient for carotid sources of emboli, and, if warranted, an MIR/MRA for further evaluation. It is well-known that pregnancy predisposes patients to thrombo-embolic phenomenon including TIA's and strokes. This is because physiologic states associated with elevated estrogen and progesterone levels such as pregnancy and the use of birth control pills cause hypercoagulabile states that are associated with increased clotting resulting in strokes [sic] and other thrombo-embolic phenomenon. Failure to make the diagnosis of TIA and to formulate a plan to treat Virginia Danos was a deviation from the standard of care and causally related to her subsequent stroke.

. . .

With a reasonable degree of medical certainty, had she been admitted and treated, her TIA would not have progressed to a left MCA stroke.

In the second report, Baker added the following paragraph:

Virginia Danos was pregnant at the time of this incident and, because of her pregnancy, she had elevated estrogen and progesterone levels. As a direct result, she was predisposed to thrombo-embolic events including TIA's and strokes. Dr. Rittger and Dr. V. Patel should have recognized that she was predisposed to these thrombo-embolic events because of her elevated estrogen and progesterone levels. High suspicions should have led them to diagnose TIA which should have resulted in admission for further evaluation and treatment.

Dr. Baker's reports detail the standard of care to which Rittger was required to conform and the breach of that standard. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). The reports provide Rittger with a fair summary of Baker's opinions concerning the standard of care and how Rittger failed to meet that standard of care. *Palacios,* 46 S.W.3d at 880. Nevertheless, Rittger argues that the reports are insufficient because Baker collectively referenced Rittger and Patel in discussing the standard of care. We disagree.

Appellees are not required to specifically state the same standard of care for each individual physician practicing on the same patient when each physician owes the same duties to the patient. *In re Boone,* 223 S.W.3d 398, 405–06 (Tex.App.-Amarillo 2006, no pet.) (holding expert report sufficient with same standard of care for multiple defendants when each defendant was performing same duties on same patient); *Romero v. Lieberman,* 232 S.W.3d 385, 391–92 (Tex.App.-Dallas 2007, no pet.) (defendants' argument that expert report was insufficient because they were not given individual standards of care and were being held to "one size fits all" standard were unmeritorious as each physician owed same duties and were held to same standard).

Rittger relies on *Taylor v. Christus Spohn Health System Corp.* and *Rittmer v. Garza* to support his contention that Baker's reports are inadequate as to the standard of care and breach because it collectively refers to a group of doctors rather than setting forth individual standards as to Rittger. *See Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 243 (Tex.App.-Corpus Christi 2005, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 721 (Tex.App.-Houston [14th Dist.] 2001, no pet.). We find both *Taylor* and *Rittmer* distinguishable.

In *Taylor*, the defendants included a hospital, a doctors' association, an emergency room physician, and a cardiologist, and the expert failed to state what each defendant should have done to meet the standard of care and failed to do, and how the failure led to the patients death. *Taylor*, 169 S.W.3d at 243. Here, Baker's report comments on the failure of a uniform duty owed by both doctors to the same patient. And, also unlike *Taylor*, Baker specifically names the individual doctors, identifies their specific negligent actions, and discusses their failures according to the uniform standard of care that both doctors owed to Danos.

In *Rittmer*, the plaintiff conceded her report failed to set out specific standards of care for two distinct specialists—an oncologist performing a mastectomy and a plastic surgeon performing reconstructive surgery. *Rittmer*, 65 S.W.3d at 722. This is distinct from Baker's articulation of a standard of care for a duty owed to a patient in an emergency room setting.

■ Rittger argues further that Baker's report failed to specify what particular actions or what additional specific care Rittger should have provided Danos. On the contrary, Baker's supplemental report indicates that, upon recognizing the high risk of TIA and stroke present during pregnancy, Rittger and Patel should have admitted Danos for further evaluation and treatment.

For the foregoing reasons, we conclude that Baker's report provides a sufficiently specific standard of care and specifically identifies the breach of that standard of care for an emergency room physician. Thus, Baker's reports meet the first and second prongs of *Palacios.*

## 2. Dr. Meyer's Report

■ Next, we review Dr. Meyer's report to determine whether it sufficiently links the alleged breaches of the standard of care with Danos's injuries. Meyer's report reads, in pertinent part:

Dr. Rittger and Dr. Patel and the triage staff at Christus St. John Hospital all fell below [the] standard of care for not admitting [Danos] and working her up for probable stroke with diagnosis of left middle cerebral artery impending thrombosis or stroke due to toxemia of pregnancy.

. . .

Christus St. John Hospital and the conduct of ER Triage nurse, C. Southard, RN, Kevin Rittger, MD, John Gillespie, MD and Victor Patel, MD were all negligent and all fell below the standard of care in their treatment of Lou Virginia Danos by not admitting her to the hospital with diagnosis of impending stroke and treating her with anti-platelet drugs, control of her BP and treatment of her eclampsia or toxemia of pregnancy and arranging for immediate Caesarian Section by delivering her child for prevention of complications or pre-eclampsia or toxemia pregnancy.

As a result, Ms. Virginia Danos suffered from thrombosis of her left middle cerebral artery as a complication of toxemia of pregnancy, which if treated early, [the] stroke would have been prevented

and she would have remained neurologically normal. Apart from termination of pregnancy by Caesarian section, control of her elevated blood pressure, plus treatment with anti-platelet drugs would have all been indicated to prevent her stroke.

We conclude that Meyer's report is sufficient to establish causation because it links Rittger's alleged breaches of the standard of care with Danos's injuries. Meyer unequivocally states that Danos suffered neurological injury as the result of appellant's breach of the standard of care. Meyer reaches this conclusion after he sets forth the pertinent standard of care and how Danos's injury could have been prevented.

Nevertheless, Rittger contends that Meyer's report is conclusory as to causation. We disagree. Meyer causally links Rittger's failure to admit and treat Danos for her pregnancy-related toxemia directly to Danos's thrombosis of her left middle cerebral artery and thus provides a sufficient basis for his opinion. Consequently, we conclude that Meyer's report satisfies the third prong of *Palacios.*

### D. Qualifications of Experts

Section 74.351 defines an "expert" with respect to a person opining as to whether a physician departed from accepted standards of medical care, as one who is qualified to testify under the requirements of Section 74.401. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(A) (Vernon Supp. 2008). Section 74.401 states that a physician is qualified to give such testimony against a physician if he: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim;

and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. REM.CODE ANN. § 74.401(a) (Vernon 2005).

When determining whether a witness is qualified on the basis of training or experience, the court considers whether, "at the time the claim arose or at the time the testimony is given, the witness (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and (2) is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c) (Vernon 2005).

The expert testifying in a medical malpractice case need not be a specialist in the particular branch of the profession for which testimony is offered; the statute setting out the requisite qualifications focuses not on the defendant doctor's area of expertise, but on the condition involved in the claim. *Blan v. Ali,* 7 S.W.3d 741, 745 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

#### 1. Dr. Baker

Baker is board certified in emergency medicine. As such, he has the training and experience to testify concerning the appropriate standard of care for an emergency room physician. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(3) (Vernon 2005). Rittger does not dispute that Baker is qualified to testify regarding the standard of care and breach. *Danos,* 253 S.W.3d at 299.

#### 2. Dr. Meyer

Rittger argues that neither Meyer's report nor his curriculum vitae qualify Meyer, a neurologist, to provide an opinion on the pertinent standard of care or breach thereof by Rittger as an emergency room physician. Danos, as the ex-

pert's proponent, has the burden to show that Meyer is qualified and that Meyer's report satisfies the statutory requirements. *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 757 (Tex.App.-Houston [14th Dist.] 2007, no pet.). No definitive guidelines exist for determining whether a witness's education, experience, skill, or training qualify him as an expert. *Id.* at 762.

As a board-certified neurologist and professor in Baylor College of Medicine's Department of Neurology, Meyer has knowledge of the accepted standards of care for brain trauma. Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those which confronted the practitioner charged with malpractice, the witness is qualified to testify. *Simpson v. Glenn,* 537 S.W.2d 114, 117 (Tex.App.-Amarillo 1976, writ ref'd n.r.e.). The treatment of patients with brain trauma is common in the field of neurology; therefore Dr. Meyer qualifies as an expert. The fact that Danos was pregnant when she experienced her stroke or that she presented herself in an emergency room setting does not require that Dr. Meyer be an obstetrician or emergency room physician. Dr. Meyer is shown to be sufficiently competent and qualified to testify as to the care of patients with stroke as a complication of pregnancy-related toxemia. *See Simpson,* 537 S.W.2d at 116–18 (concluding that general physician qualified to testify as expert against physician specializing in obstetrics and gynecology).

### III. Conclusion

The expert reports, considered together, satisfy the requirements provided in *Pa-* *lacios* by informing the appellant of the specific conduct called into question and giving the trial court a basis to conclude whether or not the claims have merit. *See Palacios,* 46 S.W.3d at 879. The reports comply with section 74.351 by detailing the standard of care to which Rittger was required to conform, the breach of that standard, and causation. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878. Based on the standards articulated in *Palacios,* we conclude that Danos made a good faith effort to comply with the statute and that the trial court did not err in overruling Rittger's objections to the expert reports. Accordingly, we hold that the trial court did not abuse its discretion in denying Rittger's motion to dismiss. We overrule Rittger's issue on appeal and affirm the order that denied Rittger's motion to dismiss.