## Robert HILLERY, M.D., and Southwest Surgical Associates, P.A., Appellants,

### v.

## Suzette KYLE, Patrice Ward, Vicki, Kyle, and Jamessee Kesee, individually and on behalf of the Estate of Melinda Kyle, Deceased, Appellees.

### No. 01–11–00708–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 17, 2012.

---

Divya Reddy Chundru, Harris, Hilburn & Sherer, Houston, TX, for Appellants.

Monica C. Vaughan, Houssiere, Durant & Houssiere, L.L.P., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and HUDDLE.

## OPINION

REBECA HUDDLE, Justice.

Robert Hillery, M.D. and Southwest Surgical Associates, P.A. bring this interlocutory appeal challenging the trial court's denial of their motion to dismiss a health care liability claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West Supp.2011). Suzette Kyle, Patrice Ward, Vicki, Kyle, and Jamessee Kesee, individually and on behalf of the Estate of Melinda Kyle, deceased (collectively, "the Kyles"), brought a health care liability claim against Hillery and Southwest, among other defendants, asserting that negligence in their care and treatment of Melinda Kyle caused her death. After the Kyles served an expert report as required by section 74.351 of the Texas Civil Practice and Remedies Code, Hillery and Southwest (collectively, "Hillery") moved to dismiss under section 74.351, contending the report is inadequate. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a) (West 2011). The trial court denied the motion to dismiss, and, on appeal, Hillery contends the trial court erred because Dr. Goldman, the Kyles' expert, is not qualified and because the report is inadequate concerning causation. We affirm.

## Background

On September 15, 2008, Melinda Kyle was admitted to Oak Bend Medical Center with a gangrenous right toe. Melinda was sixty-nine years old with a history of diabetes, hypertension, coronary artery disease, and peripheral vascular disease. She also took blood-thinning medication to prevent clotting.

Melinda's attending doctor was Dr. Mark Murray. Shortly after being admitted, Melinda had a stent placed in her leg to try to restore blood flow to her foot. She also saw a cardiologist, Dr. James McClamroch, on September 17. The procedure did not restore blood flow to Melinda's foot, and, on September 22, 2008, Dr. Uttam Tripathy, a vascular surgeon performed a bypass graft. Although it is unclear when, at some point, Melinda was placed on a Heparin drip to prevent clotting. Dr. Tripathy ordered that the Heparin drip be discontinued one hour before surgery and resumed four hours after surgery.

The bypass graft was not successful. Accordingly, Hillery, a general surgeon, was consulted. He performed a below knee amputation on Melinda's right leg on September 24, 2008. Hillery ordered the Heparin drip discontinued before surgery. After the surgery was completed, the Heparin drip was not resumed.

Melinda was monitored in the intensive care unit after the amputation. On September 25, while Melinda was still in the ICU, testing by Dr. McClamroch and Dr. Tripathy showed inadequate anti-coagulation. On September 26, Melinda was extubated. A test performed that day again showed inadequate anti-coagulation. On September 29, 2008, despite a still inadequate level of anti-coagulation, Dr. McClamroch approved Melinda's transfer out of ICU. Dr. Tripathy also examined Melinda and ordered her transfer. Dr. Murray also ordered Melinda's transfer. Approximately one hour after her transfer, a nurse found Melinda lethargic and unresponsive. Melinda was resuscitated and reintubated. However, she had suffered anoxic encephalopathy—brain damage caused by lack of oxygen.

Melinda was transferred back to the ICU. At that time, she was placed back on the Heparin drip. Dr. McClamroch ordered a test that showed myocardial infarction was not the cause of Melinda's respiratory arrest. Further testing indicated that there was no significant blood

flow to the brain. Melinda was declared brain dead. She was extubated on October 6, 2008. Melinda was transferred for hospice care where she remained until she died on October 12, 2008.

The Kyles brought this health care liability claim against Dr. Tripathy, Dr. Murray, Dr. McClamroch, Hillery, and the professional associations with which each doctor was associated. As required by statute, the Kyles filed an expert report by Dr. Stephen Goldman. Hillery moved to dismiss the Kyles' suit against him, objecting to the report on the ground that Dr. Goldman, who is a cardiologist, is not qualified to opine on the standard of care applicable to Hillery, a general surgeon. Hillery also objected that Dr. Goldman's opinion is conclusory because it does not link the facts of the case to his conclusion that Hillery's breach of the standard of care caused Melinda's death. The trial court denied the motion to dismiss and Hillery appealed.

## Standard of Review

■ We review a trial court's ruling on a motion to dismiss a health care liability lawsuit pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001) (reviewing dismissal under predecessor statute, section 13(e) of article 4590i); *Runcie v. Foley*, 274 S.W.3d 232, 233 (Tex. App.-Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles, or if it clearly fails to analyze or apply the law correctly. *Runcie*, 274 S.W.3d at 232. In reviewing whether an expert report complies with Chapter 74, we evaluate whether the report "represents a good-faith effort" to comply with

the statute. *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must look only at the information contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002).

## Qualifications

■ In his first issue, Hillery contends that the trial court abused its discretion in not dismissing the Kyles' claim because Dr. Goldman is not qualified to offer an opinion concerning the standard of care in this claim.

Section 74.351(r)(5)(A) requires that an expert opining on "whether a physician departed from accepted standards of medical care" meet the qualifications set forth in section 74.401. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(A) (West 2011). Section 74.401(a) provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a) (West 2011). Section 74.401 continues:

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(c).

The first requirement set forth in section 74.401(a) is that Dr. Goldman "is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose." TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(1). Hillery does not challenge this requirement.

The second and third requirements of section 74.401(a) are that Dr. Goldman have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care." *Id.* § 74.401(a)(2), (3). These are the requirements Hillery contends Dr. Goldman fails to meet.

Specifically, Hillery argues that Dr. Goldman is not qualified because he is a cardiologist who is board certified in cardiovascular disease and internal medicine, but nothing in his report or curriculum vitae shows that he is qualified to opine on the area of general surgery or below-knee amputation, the medical care provided by Hillery in this case. An expert need not be practicing in the same field as a defendant in a health care liability claim in order to qualify as an expert. *Rittger v.*

*Danos,* 332 S.W.3d 550, 558 (Tex.App.-Houston [1st Dist.] 2009, no pet.); *Blan v. Ali,* 7 S.W.3d 741, 745 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Rather the statute requires that the expert have knowledge of the condition involved in the claim. TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2); *Rittger,* 332 S.W.3d at 558 (noting focus is not on defendant doctor's area of expertise, but on the condition involved in the claim). The mere fact that Dr. Goldman is not a general surgeon, therefore, does not necessarily render him unqualified.

In his report, Dr. Goldman states that he is familiar with the standards of care relevant to the condition involved in this claim. Specifically, Dr. Goldman states that, as part of his practice, he treats, and has diagnosed and treated, "patients with conditions similar to those experienced by Melinda Kyle including coronary artery disease, hypertension, hyperlipidemia, diabetes, and peripheral vascular disease." He also states that

> [T]here is considerable overlap in my specialty and that of physicians caring for patients in a critical care setting including pulmonology, vascular disease and internal medicine. My area of specialties overlaps the physicians involved in the care of Melinda Kyle in the diagnosis, treatment and management of patients with stents.... By virtue of my education, training and experience, I am well familiar with the standards of care applicable to the diagnosis and treatment of patients like Melinda Kyle with a history of coronary artery disease, hypertension, hyperlipidemia, diabetes and peripheral vascular disease who have undergone surgery.

Dr. Goldman also explains the basics of the cardiovascular system and how blood clots in the legs may develop. The risk of

clots is "significantly increased in patients who have suffered a trauma in the lower extremities such as would occur during a surgical procedure." He further elaborates,

The risk of pulmonary embolism and thrombotic complications following surgery or immobilization has been well-known for decades. It is well established that patients who are unable to move well, who are obese or bedridden, and therefore have markedly decreased movement in their legs and bodies, should be given some type of thrombo-embolism prophylaxis. .... It has been well established that administration of anticoagulant medications like Heparin can prevent clots from forming thereby preventing the development of pulmonary emboli.

Within the section of his report dealing with Hillery's alleged breach of the standard of care, Dr. Goldman also states,

The standard of care required Robert Hillery, M.D., the general surgeon attending to Ms. Kyle, to ensure that proper anticoagulation occurred following surgery. The standard of care required Dr. Hillery to order administration of Heparin for Mrs. Kyle to prevent the formation of pulmonary embolism and thrombotic complications. This standard applies to all of the healthcare providers involved in the care of Mrs. Kyle as the need for administration [of] Heparin to anti-coagulate a patient following surgery involving the hip, leg or lower extremities is well known among physicians practicing surgery, cardiology and internal medicine.

Furthermore, as stated above, the statute setting forth the qualifications required of an expert does not focus on the defendant's specialty but on the condition involved in the claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2); *Rittger*, 332 S.W.3d at 558. Hillery asserts that he was "consulted solely regarding amputation" and not to provide any other care. However, in this case, Hillery's conduct related to the amputation or general surgery is not the basis of the Kyles' claim. Rather, the basis of the claim and the focus of Dr. Goldman's report is the failure to properly anti-coagulate Melinda following the surgery. The Kyles alleged that Hillery and the other defendants were negligent by failing to "properly diagnose and prescribe necessary medications to Melinda Kyle," "anticoagulate Melinda Kyle," "properly recognize and diagnose the condition of Melinda Kyle, deceased, including, but not limited to hypercoaguable state," and "properly and timely treat Melinda Kyle." Hillery does not assert that Dr. Goldman, who is board-certified in cardiovascular diseases and internal medicine, is not qualified to offer an opinion on the standard of care relating to the need to administer anti-coagulation medication following surgery.

Because Dr. Goldman's report and curriculum vitae demonstrate his knowledge and experience treating patients in circumstances similar to those that form the basis of the allegations in this claim, the trial court did not abuse its discretion in finding Dr. Goldman qualified. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2); *Rittger*, 332 S.W.3d at 558 (neurologist qualified to provide expert opinion on standard of care or breach thereof by emergency room physician where prospective medical expert had practical knowledge of what is usually and customarily done by practitioners under similar circumstances); *see also Barber v. Mercer*, 303 S.W.3d 786, 795 (Tex. App.-Fort Worth 2009, no pet.) (holding anesthesiologist qualified to opine on conduct of surgeon in health care liability claim because anesthesiologist's report tied his education, training, and experience to

the specific alleged breach—the positioning and padding of a patient during surgery, not the conduct of the actual operating techniques); *Blan*, 7 S.W.3d at 746 (condition involved in claim was stroke, therefore, neurologist qualified as expert although defendants were emergency room physician and cardiologist).

## Adequacy of Report

In his second issue, Hillery contends that Dr. Goldman "fails to adequately set forth the standard of care, breach of the standard of care, and the causal relationship between the breach and injury" as required by section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

## A. Chapter 74 expert report requirements

Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report. TEX. CIV. PRAC. & REM.CODE § 74.351(a). If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent an objective good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l*). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions, as of the date of the report, regarding: (1) the applicable standards of care; (2) the manner in which the care rendered failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Gray v. CHCA Bayshore,*

*L.P.,* 189 S.W.3d 855, 858–59 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878; *Gray,* 189 S.W.3d at 859. In detailing these elements, the report must provide enough information to fulfill two purposes: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* " '[T]he expert must explain the basis of his statements to link his conclusions to the facts.' " *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Scoresby,* 346 S.W.3d at 556 (citing *Palacios,* 46 S.W.3d at 878); *Wright,* 79 S.W.3d at 53.

## B. Hillery's objection

Hillery's objection to Dr. Goldman's report in the trial court stated, in its entirety:

> Dr. Goldman's report is inadequate because it is conclusory and fails to provide any factual support for the opinion expressed within. Dr. Goldman states that myocardial infarction was ruled out as the cause of Mrs. Kyle's arrest. However, Dr. Goldman fails to provide any factual support for his conclusion that Mrs. Kyle developed blood clots and

pulmonary emboli that were the cause of her respiratory arrest as a result of failure [t]o provide appropriate post operative drugs.

Because Hillery objected only on the grounds that the report was conclusory concerning the element of causation, and did not mention the elements of standard of care or breach, we do not address that portion of Hillery's issue concerning standard of care and breach. *See* Tex.R.App. P. 33.1(a); *Hawkins v. Herrera,* 296 S.W.3d 366, 370 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (refusing to address objections by defendant physician who did not raise objections in trial court); *see also Plemons v. Harris,* No. 02–08–00326–CV, 2009 WL 51290, *3 (Tex.App.-Fort Worth Jan. 8, 2009, no pet.) (mem. op.) (holding objection to expert report made in trial court must comport with complaint asserted on appeal); *Williams v. Mora,* 264 S.W.3d 888, 891(Tex.App.-Waco 2008, no pet.) (holding that when defendant's only timely filed objections to expert report were that two statements were speculative, defendant waived all other objections).

## C. Adequacy of report concerning causation

As set forth above, Hillery's objection to the adequacy of Dr. Goldman's report is that "Dr. Goldman fails to provide any factual support for his conclusion that Mrs. Kyle developed blood clots and pulmonary emboli that were the cause of her respiratory arrest as a result of failure [t]o provide appropriate post operative drugs." An expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). An expert cannot merely state his conclusions or "provide insight" about the plaintiffs' claims, but must instead "explain the

basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52. In explaining causation, the report must explain how the physician's conduct caused the plaintiff's injuries. *Id.* at 53.

Dr. Goldman's report concerning causation is not conclusory. As discussed above, Dr. Goldman explains the functioning of the cardiovascular system, including how decreased physical movement causes a patient to be more prone to clotting, and how formation of clots causes inadequate oxygenation, respiratory arrest, and brain injury. He also describes and explains the risk factors for developing clots and pulmonary emboli, many of which existed in Melinda's case, predisposing her to their development:

> Melinda Kyle had multiple risk factors that predisposed her to the development of blood clots and pulmonary emboli. Ms. Kyle was obese, had heart disease, peripheral vascular disease and was immobile. Ms. Kyle had also just undergone a below knee amputation, a procedure that is in itself a risk factor for development of pulmonary emboli. Ms. Kyle should have been placed back upon Heparin following this surgery. In reasonable medical probability, had the Heparin drop been resumed for Ms. Kyle following her amputation surgery, she would not have developed the blood clots and pulmonary emboli that were, in all probability, the cause of her respiratory arrest on September 29, 2008. Ms. Kyle would not have suffered the respiratory arrest on September 29, 2008 if Heparin had been reinstituted and would not have sustained the anoxic brain injury caused by her arrest.

Concerning Hillery's conduct, Dr. Goldman states:

> The standard of care required Robert Hillery, M.D., the general surgeon attending to Ms. Kyle, to ensure that

proper anticoagulation occurred following surgery. The standard of care required Dr. Hillery to order administration of Heparin for Ms. Kyle to prevent the formation of pulmonary embolism and thrombotic complications. This standard applies to all of the health care providers involved in the care of Ms. Kyle as the need for administration Heparin to anti-coagulate a patient following surgery involving the hip, leg or lower extremities is well known among physicians practicing surgery, cardiology and internal medicine. Ms. Kyle was a patient with multiple risk factors for the development of pulmonary emboli notably including surgery on the leg which is itself a risk factor sufficient to warrant administration of Heparin prophylactically following surgery. For Ms. Kyle, a patient with multiple risk factors that placed her at an even greater risk for the development of pulmonary emboli, administration of Heparin was essential to prevent formation of blood clots. By failing to order the Heparin resumed and failing to ensure that Ms. Kyle was receiving Heparin following her surgery, Dr. Hillery breached and violated the standard of care. In reasonable medical probability, if Dr. Hillery had met the standard of care and ordered Heparin following surgery, Heparin would have been resumed in Ms. Kyle and she would not have developed the pulmonary emboli that caused her respiratory arrest and anoxic brain injury and she would have survived her hospitalization.

In the "Conclusion" section of the report, Dr. Goldman summarizes:

Ms. Kyle had several strong and obvious risk factors for pulmonary emboli yet she was not placed back on Heparin following her below knee amputation. This was below the standard of care for all of the physicians attending to Ms. Kyle. The failure to resume Heparin following her surgery, in reasonable medical probability, caused the formation of blood clots that blocked the flow of oxygen and caused her to suffer a respiratory arrest on September 29, 2008.

Dr. Goldman does more than just state his conclusions or provide insight regarding the Kyle's claims. *See Wright,* 79 S.W.3d at 52. He explains the medical causes of the formation of clots, including conditions that increase the risk, and that these risks are well-known. He identifies Melinda as having several of these risk factors, including a trauma in the form of a surgical amputation of her leg below the knee. He explains that treatment using a drug such as Heparin is well-established to help prevent clots from forming and that the standard of care required the defendants, including Hillery, to administer Heparin following surgery. He explains that the test ordered by other defendants ruled out a myocardial infarction. And, finally, he opines that the likely cause of Melinda's death was the development of blood clots and pulmonary emboli and that she would not have developed the clots and pulmonary emboli had the Heparin been resumed following the amputation surgery. We conclude that this is a fair summary of the causal relationship between Hillery's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. *See Manor Care Health Servs., Inc. v. Ragan,* 187 S.W.3d 556, 564 (Tex. App.-Houston [14th Dist.] 2006, pet. granted, judgment vacated w.r.m.) (concluding report adequate concerning causation where report stated that administration of anticoagulant medication was necessary to prevent pulmonary emboli and that as result of failure to administer drugs patient probably suffered pulmonary emboli and consequently died); *cf. Shenoy v. Jean,* No. 01–10–01116–CV, 2011 WL 6938538, at

*7 (Tex.App.-Houston [1st Dist.] Dec. 29, 2011, no pet. h.) (mem op.) (holding report inadequate concerning causation because it failed to link decedent's pre-existing conditions to an increased risk for the injury involved in that claim).

In his appellate brief, Hillery also argues that Dr. Goldman's opinion is speculative because he "fails to offer any factual data, clinical, radiological and the like[,] to support his assumption that blood clots and pulmonary emboli formed which caused Ms. Kyle's respiratory arrest. There are a multitude of causes for respiratory arrest for a 5–day postoperative patient." To the extent this is an argument, distinct from the one discussed above, that Dr. Goldman did not rule out all possible causes of death, we overrule it. *See Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace,* 278 S.W.3d 552, 562 (Tex.App.-Dallas 2009, no pet.) ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed."); *see also Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 199 n. 2 (Tex. App.-Houston [14th Dist.] 2009, no pet.) (whether expert's opinion is correct or not is issue for summary judgment, not Chapter 74 motion to dismiss); *Manor Care Health Servs., Inc.,* 187 S.W.3d at 564 (report stating failure to administer anticoagulant drugs probably caused pulmonary emboli that caused death sufficient statement of causation).

## Conclusion

We affirm the order of the trial court.