**Opinion issued September 27, 2012**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-12-00363-CV

—————————————

**HOWARD H. HOOD, M.D., Appellant**

**V.**

**JOHN KUTCHER, Appellee**

---

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-05581**

---

## MEMORANDUM OPINION

In this interlocutory appeal, appellee, John Kutcher, sued appellant, Howard

H. Hood, M.D., for medical malpractice.  Hood moved to dismiss Kutcher's claims

on the ground that Kutcher's expert report did not constitute a good faith effort to

comply with the statutory requirements for expert reports and was therefore insufficient. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6) (Vernon Supp. 2012). The trial court denied Hood's motion. In one issue, Hood contends that the trial court erred in denying his motion to dismiss because Kutcher's expert report did not adequately set out the causal connection between the alleged breach of the standard of care and the alleged harm and, therefore, did not comply with the requirements of section 74.351.

We affirm.

## Background

On August 4, 2010, Kutcher fell on broken glass and suffered a laceration to his right thigh. Dr. Hood began treating his injury at the Memorial Medical Center in Livingston. Dr. Hood applied a pressure dressing to the wound and sent Kutcher to the radiology department for radiographs of his right femur and upper leg. When Kutcher returned from the radiology department, Dr. Hood administered antibiotics and intravenous fluids and applied another pressure dressing to the wound. Dr. Hood provided Kutcher with "Wound Care—Laceration" instructions and discharged him from the hospital.

Less than a month later, on August 30, 2010, Kutcher underwent a CT examination at St. Joseph Medical Center, which revealed the presence of multiple foreign bodies—pieces of glass—in the wound. At St. Joseph, physicians opened

up the wound, washed the wound, and removed the remaining pieces of glass. Kutcher's post-operative course of care was "lengthy," and he "required multiple wound care follow up evaluations."

Kutcher then sued Dr. Hood for medical malpractice in January 2011. Kutcher alleged, "Dr. Hood's failure to document the wound care, and failure to properly clean the wound proximately caused the injuries sustained by [Kutcher] for which he now brings suit." Kutcher served Dr. Hood with the expert report and the curriculum vitae of Dr. Kenneth Direkly, a physician who is board certified in emergency medicine.

Dr. Hood timely objected to Dr. Direkly's expert report, arguing that the report did not constitute a good faith effort to comply with the statutory requirements of section 74.351. Dr. Hood objected, among other grounds, on the basis that Dr. Direkly's causation opinion was "conclusory, speculative, and contain[ed] analytical gaps in its causal links." In response, Kutcher moved for a thirty-day extension of time to file and serve an amended expert report. The trial court granted this motion in October 2011.

On November 2, 2011, Kutcher served Dr. Direkly's amended expert report. In setting out the applicable standard of care, Dr. Direkly cited several "medical reference sources" that "discuss appropriate wound care management." One source provides that "[m]eticulous preparation of the skin surrounding the wound

3

and the actual wound, irrigation, and wound debridement are tantamount to good wound healing." Each of the cited sources states that physicians should visually inspect the wound, are responsible for detecting and identifying foreign bodies within the wound, and should inform the patient if the physician decides not to remove any foreign bodies. Dr. Direkly opined that the standard of care for an emergency-room physician treating an open laceration with the possibility of wound contamination requires the physician to:

(1)     Ensure that the wound is properly explored, prepared, and cleaned—including irrigation and debridement, if necessary—to detect foreign bodies and reduce the likelihood of wound contamination and subsequent infection and to promote proper healing.

(2)     Discuss with the patient the potential for retained foreign bodies in the wound and the need for alertness to this possibility and seeking additional and follow-up treatment.

(3)     Document that the appropriate exploration and cleaning of the wound has been accomplished and that the patient has been informed of the possible need for additional treatment and the potential for foreign body retention.

Concerning breach of the standard of care, Dr. Direkly noted that the records of Dr. Hood's treatment of Kutcher contained "a significant paucity of documentation [in] the 'Procedures' note section." He stated,

The documentation lists wound repair by eight staples. No other documentation is recorded; neither by hand written entry or circled pre-printed findings. No wound preparation or cleaning is documented. No wound exploration is documented. In addition to the physician's charting, no wound cleaning orders were documented

4

by the nurse, nor is there documentation of any wound cleaning or preparation by the nursing staff.

Dr. Direkly opined that Dr. Hood breached the applicable standard of care in "several fundamental areas":

(1) Dr. Hood failed to appropriately document proper wound care and failed to document any discussion with the patient about potential retained foreign bodies.

(2) Dr. Hood's lack of documentation fails to demonstrate that appropriate wound care procedures were followed. Based on the available medical records, including medical records from St. Joseph Medical Center, I believe that thorough wound exploration and cleaning was not performed by Dr. Hood during Mr. Kutcher's initial medical treatment. This failure to explore and clean Mr. Kutcher's wound was a breach of the standard of care.

(3) Dr. Hood's failed documentation is, itself, a breach of the standard of care. While it did not, in itself, cause Mr. Kutcher harm, it is indicative and evidentiary of the substandard treatment he received.

Dr. Direkly concluded that "[s]ignficant subsequent medical treatments including surgery were necessary as a result of Mr. Kutcher's retained foreign bodies within his laceration." Dr. Direkly detailed Kutcher's subsequent treatment at St. Joseph: Kutcher had a CT examination, which revealed "multiple subcentimeter retained foreign bodies." He then underwent an "incision and drainage procedure," and, several weeks after that procedure, his medical records noted that his wound was reopened and washed out, and physicians "removed some glass that was still in the wound." Dr. Direkly opined that, had Dr. Hood

5

initially treated Kutcher "appropriately within the standard of care by following the appropriate wound care procedures, in reasonable probability, those foreign bodies would not have been present to cause infection." "At the very least," if Dr. Hood had informed Kutcher that pieces of glass likely remained in his wound, Kutcher "would have known to be alert to the possibility and seek additional follow-up treatment that would, in reasonable probability have prevented infection from setting in." Dr. Direkly concluded,

> In reasonable probability, Mr. Kutcher's extensive additional procedures and post-operative course would not have occurred but for Dr. Hood's failure to treat his laceration appropriately upon presentation to the emergency room at Memorial Medical Center or, at the very least, had Mr. Kutcher been warned of the possibility and potential of foreign body retention and subsequent infection requiring additional treatment.

Dr. Direkly ultimately concluded that Dr. Hood failed to document that he followed proper wound care procedures in treating Kutcher, and, based on Kutcher's medical records and ensuing infection, he "in reasonable probability, failed to perform appropriate medical treatment" for Kutcher's injuries. This deficient care "subsequently led to extensive medical evaluations, surgeries, and treatments."

Dr. Hood objected to Dr. Direkly's amended expert report and moved to dismiss Kutcher's suit pursuant to section 74.351. Dr. Hood again argued that the expert report was "conclusory, speculative, and fail[ed] to sufficiently address the

6

elements required by Chapter 74." Dr. Hood argued that the expert report failed "to adequately link the alleged breaches of the standard of care to the harm suffered by Mr. Kutcher." He argued that Dr. Direkly never explained the "appropriate wound care procedures" that Dr. Hood failed to follow, and he "only criticize[d] Dr. Hood's alleged failure to document that appropriate wound care procedures were followed." Dr. Direkly's "causal connection [was], therefore, not linked to the facts." Dr. Hood also argued that Dr. Direkly: (1) did not explain how or why following appropriate wound care procedures would have prevented the harm to Kutcher; (2) did not explain how a foreign body could cause infection or that it did cause Kutcher's infection; and (3) did not specify the acts or omissions that actually caused the harm or what Dr. Hood could have done to prevent the harm. Dr. Direkly thus failed to explain how and why Dr. Hood's breach of the standard of care caused Kutcher's injury.

The trial court denied Dr. Hood's motion to dismiss. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon Supp. 2012) (providing for interlocutory appeal of trial court order denying motion to dismiss pursuant to section 74.351).

**Sufficiency of Expert Report**

In his sole issue on appeal, Dr. Hood contends that the trial court erroneously denied his motion to dismiss because Dr. Direkly's expert report did

7

not constitute a good faith effort to comply with the requirements of section 74.351(r)(6). Specifically, Dr. Hood argues that the expert report "fails to describe the causal connection between the alleged breaches of the standard of care by Dr. Hood and the harm suffered by Mr. Kutcher."

### A. Standard of Review

We review a trial court's ruling on a section 74.351 motion to dismiss for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). The trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). In reviewing a trial court's ruling, we may not substitute our judgment for that of the trial court. *Id.* Mere disagreement with the trial court's decision is insufficient to constitute an abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

### B. Requirements of Section 74.351(r)(6)

A plaintiff in a medical malpractice action must serve each defendant with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). If the plaintiff timely serves an expert report, the defendant-physician may file a motion objecting to the sufficiency of the report. *See id.*; *Hillery v. Kyle*, 371 S.W.3d 482, 489 (Tex. App.—Houston [1st Dist.] 2012, no pet. h.). The trial court shall grant a

motion challenging the adequacy of an expert report only if it appears to the court that the report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 221 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Subsection 74.351(r)(6) defines "expert report" as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 879; *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858–59 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The expert report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on the three statutory elements: standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 878–79; *Gray*, 189 S.W.3d at 859. To constitute a "good faith effort" to comply with the statute, the expert report must provide enough information to fulfill two purposes: (1) the report must inform the defendant of the specific conduct that the plaintiff has called into question; and (2) the report must provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859. An

9

expert report that merely states the expert's conclusions regarding the three statutory elements does not fulfill these two purposes. *Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859; *see also Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011) ("No particular words or formality are required [in the expert report], but bare conclusions will not suffice."). In the report, the expert must explain the basis for his statements and must link his ultimate conclusions to the facts of the particular case. *Wright*, 79 S.W.3d at 52; *Gray*, 189 S.W.3d at 859. In assessing the sufficiency of the report, the trial court may not draw any inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *Wright*, 79 S.W.3d at 52; *Gray*, 189 S.W.3d at 859.

Whether an expert's factual inferences made in the expert report are accurate is a question for the fact finder and should not be considered when ruling on a section 74.351 motion to dismiss. *See Gannon v. Wyche*, 321 S.W.3d 881, 892 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *see also Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 265 (Tex. App.—Fort Worth 2009, no pet.) ("[The 'four corners'] requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. However, section 74.351 does not prohibit *experts*, as opposed to courts, from making inferences based on medical history.") (emphasis in original). The question of whether an expert is correct in his assertions is an issue for summary

10

judgment, not a Chapter 74 motion to dismiss. *See Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

### C.     Dr. Direkly's Expert Report

In his expert report, Dr. Direkly cited several medical reference sources that "discuss appropriate wound care management."  According to these sources, "[m]eticulous preparation of the skin surrounding the wound and the actual wound, irrigation, and wound debridement are tantamount to good wound healing"; "[e]very effort should be made to identify foreign bodies [in the wound], even if they are not likely to be removed"; the patient should be informed if the physician is not going to remove foreign bodies; "[v]isual wound inspection, down to the full depth and along the full course of the wound, is the most important method of detecting foreign bodies"; "[t]he most important step in prevention of a wound infection is adequate irrigation and debridement," which is "the removal of foreign matter and devitalized tissue from the wound"; and "[t]he key is to document all efforts and explain to the patient the possibility of a foreign body."  Dr. Direkly opined that the standard of care thus required Dr. Hood to:

(1)     Ensure that the wound is properly explored, prepared, and cleaned—including irrigation and debridement, if necessary—to detect foreign bodies and reduce the likelihood of wound contamination and subsequent infection and to promote proper healing.

11

(2)    Discuss with the patient the potential for retained foreign bodies in the wound and the need for alertness to this possibility and seeking additional and follow-up treatment.

(3)    Document that the appropriate exploration and cleaning of the wound has been accomplished and that the patient has been informed of the possible need for additional treatment and the potential for foreign body retention.

In the section of the expert report addressing alleged breach of the standard of care, Dr. Direkly discussed several "documentation deficiencies." Dr. Direkly acknowledged that, although Dr. Hood's "failed documentation is, itself, a breach of the standard of care," this failure did not "in itself" cause Kutcher any harm. Dr. Direkly did, however, note that Kutcher's medical records contained "a significant paucity of documentation [in] the 'Procedures' note section." Dr. Direkly observed that Kutcher's records indicated that he received eight staples to close the wound, but the records contained no other documentation concerning wound repair. Dr. Direkly stated, "No wound preparation or cleaning is documented. No wound exploration is documented. In addition to the physician's charting, no wound cleaning orders were documented by the nurse, nor is there documentation of any wound cleaning or preparation by the nursing staff." He concluded that Dr. Hood "failed to appropriately document proper wound care and failed to document any discussion with the patient about potential retained foreign bodies." He also inferred, from Dr. Hood's lack of documentation concerning wound care procedures, that "thorough wound exploration and cleaning was not performed"

12

during Kutcher's initial treatment. Dr. Direkly opined that "[t]his failure to explore and clean Mr. Kutcher's wound" breached the standard of care.

On appeal, Dr. Hood contends that the expert report is insufficient because it "fails to describe the causal connection between the alleged breaches of the standard of care by Dr. Hood and the harm suffered by Mr. Kutcher" and "does not provide a factual basis for [the] causal theory that Dr. Hood's alleged breach caused the harm to Mr. Kutcher."

In the causation section of the expert report, Dr. Direkly noted that "[s]ignificant subsequent medical treatments including surgery were necessary as a result of Mr. Kutcher's retained foreign bodies within his laceration." Specifically, nearly one month after Dr. Hood treated Kutcher, Kutcher underwent a CT examination at St. Joseph, which revealed "multiple subcentimeter retained foreign bodies." Kutcher then had an "incision and drainage procedure" and another procedure in which physicians reopened Kutcher's wound, washed the wound, and removed pieces of glass that were still in the wound. Dr. Direkly concluded that, in reasonable probability, "Mr. Kutcher's extensive additional procedures and post-operative course would not have occurred but for Dr. Hood's failure to treat his laceration appropriately upon presentation to the emergency room at Memorial Medical Center . . . ." Dr. Direkly also opined that, had Dr. Hood followed the standard of care and properly treated Kutcher by "following the appropriate wound

care procedures," in reasonable probability, glass would not have remained in Kutcher's wound and therefore would not have been present to cause Kutcher's subsequent infection.

Dr. Direkly's expert report thus set out the applicable standard of care, which required Dr. Hood to visualize and inspect the wound to detect the presence of foreign bodies in the wound, such as stray pieces of glass, and to perform irrigation and debridement procedures to remove any foreign bodies located in the wound. Dr. Direkly inferred, based upon the medical records from Kutcher's subsequent procedures at St. Joseph—which revealed that, over one month after his injury, glass fragments remained in the wound—and Dr. Hood's failure to document the procedures that he used to clean Kutcher's wound, which is in itself a breach of the standard of care, that "thorough wound exploration and cleaning" did not occur, which breached the standard of care. *See Thiel*, 296 S.W.3d at 265 (noting that section 74.351 does not prohibit experts from making inferences based upon patient's medical history); *see also Gannon*, 321 S.W.3d at 892 (noting that accuracy of expert's inferences is issue for summary judgment, not for section 74.351 motion to dismiss); *Shepherd-Sherman*, 296 S.W.3d at 199 n.2 (noting same). Dr. Direkly then concluded that, due to Dr. Hood's failure to appropriately clean and care for Kutcher's wound upon initial presentment, pieces of glass remained in Kutcher's wound, which subsequently caused an infection and

14

necessitated additional surgical procedures to clean the wound and remove the glass fragments.[1]  In Dr. Direkly's opinion, if Dr. Hood had used appropriate wound care procedures, such as irrigation and debridement, at the time that he initially saw Kutcher, foreign bodies would not have remained in the wound to cause infection and Kutcher would not have needed the "extensive additional procedures and post-operative course" to remove the glass fragments at a later date.  Dr. Direkly's expert report thus links his conclusions to the particular facts of the case. *Wright*, 79 S.W.3d at 52.

Dr. Hood contends, quoting the Texas Supreme Court's decision in *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010), that the expert report must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented" and that Dr. Direkly's expert report did not meet this requirement.  As stated above, however, Dr. Direkly's expert report satisfied this requirement by stating the alleged breach—failure to thoroughly explore and clean

---

[1]  Dr. Hood criticizes Dr. Direkly's failure to "explain how this follow up care [received at St. Joseph] and the other follow up care provided to Mr. Kutcher was insufficient."  Dr. Hood misunderstands why Kutcher's need for follow-up care is significant.  Kutcher raises no complaint about the quality of his follow-up care and does not allege that the follow up care contributed to his injuries.  Instead, he contends that the follow up care is *part of* his injury, as he argues that the follow up care would not have been necessary had Dr. Hood appropriately treated his wound on initial presentation.  Dr. Direkly's expert report reflects this contention, stating, "In reasonable probability, Mr. Kutcher's extensive additional procedures and post-operative course would not have occurred but for Dr. Hood's failure to treat his laceration appropriately upon presentation to the emergency room at Memorial Medical Center . . . ."

Kutcher's wound—and how the breach caused the injury—as a result of Dr. Hood's failure, glass fragments remained in Kutcher's wound which led to an infection and required Kutcher to undergo several subsequent procedures to clean and remove all remaining glass fragments from the wound. *Contra id.* at 540 ("[The expert report] offers no more than a bare assertion that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach caused the injury."); *Gray*, 189 S.W.3d at 860 ("[T]he report provides only the conclusory statement that the failure to monitor caused Gray's injury. By not fleshing out how appellees' failure to monitor Gray's extremities caused her injury, the report does not convincingly tie the alleged departure from the standard of care to the specific facts of the case.").

We conclude that Dr. Direkly's expert report provides a "fair summary" of his opinions concerning the applicable standard of care, the manner in which Dr. Hood allegedly breached that standard, and the causal connection between Dr. Hood's breach and the harm suffered by Kutcher. We also conclude that Dr. Direkly's expert report informs Dr. Hood of the specific conduct called into question and provides a basis for the trial court to conclude that the claims have merit. *See Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859. Because Dr. Direkly's expert report constitutes a "good faith effort" to comply with the

16

requirements of section 74.351, we hold that the trial court did not abuse its discretion in denying Dr. Hood's motion to dismiss Kutcher's claims.

We overrule Dr. Hood's sole issue.

## Conclusion

We affirm the order of the trial court.


                                        Evelyn V. Keyes
                                        Justice

Panel consists of Justices Keyes, Massengale, and Brown.