Opinion issued
May 17, 2012.



In
The

Court of
Appeals

For
The

First District
of Texas

————————————

NO. 01-11-00708-CV

———————————

Robert Hillery,
M.D., and Southwest Surgical

Associates, P.A., Appellants

 

V.

Suzette Kyle,
Patrice Ward, ViCki, Kyle, and Jamessee Kesee, individually and on behalf of
the Estate of Melinda Kyle, deceased, Appellees



 



 

On Appeal from the 240th
District Court

Fort Bend County, Texas



Trial Court Case No. 10-DCV-186324

 



 

 

O P
I N I O N

 

          Robert
Hillery, M.D. and Southwest Surgical Associates, P.A. bring this interlocutory
appeal challenging the trial court’s denial of their motion to dismiss a health
care liability claim.  See Tex.
Civ. Prac. & Rem. Code Ann. § 51.014(a)(9)
(West Supp. 2011).  Suzette Kyle, Patrice
Ward, Vicki, Kyle, and Jamessee Kesee, individually and on behalf of the Estate
of Melinda Kyle, deceased (collectively, “the Kyles”),
brought a health care liability claim against Hillery and Southwest, among
other defendants, asserting that negligence in their care and treatment of
Melinda Kyle caused her death.  After the
Kyles served an expert report as required by section 74.351 of the Texas Civil
Practice and Remedies Code, Hillery and Southwest (collectively, “Hillery”)
moved to dismiss under section 74.351, contending the report is inadequate.  See
Tex. Civ. Prac. & Rem. Code § 74.351(a) (West 2011).   The trial court denied the motion to dismiss,
and, on appeal, Hillery contends the trial court
erred because Dr. Goldman, the Kyles’ expert, is not qualified and because the
report is inadequate concerning causation. 
We affirm.

Background

          On
September 15, 2008, Melinda Kyle was admitted to Oak Bend Medical Center with a
gangrenous right toe.  Melinda was
sixty-nine years old with a history of diabetes, hypertension, coronary artery
disease, and peripheral vascular disease. 
She also took blood-thinning medication to prevent clotting.

          Melinda’s
attending doctor was Dr. Mark Murray.  Shortly
after being admitted, Melinda had a stent placed in her leg to try to restore
blood flow to her foot.  She also saw a
cardiologist, Dr. James McClamroch, on September 17.  The procedure did not restore blood flow to
Melinda’s foot, and, on September 22, 2008, Dr. Uttam
Tripathy,
a vascular surgeon performed a bypass graft. 
Although it is unclear when, at some point, Melinda was placed on a
Heparin drip to prevent clotting.  Dr. Tripathy ordered that the Heparin drip be discontinued one
hour before surgery and resumed four hours after surgery.

          The bypass
graft was not successful.  Accordingly,
Hillery, a general surgeon, was consulted. 
He performed a below knee amputation on Melinda’s right leg on September
24, 2008.  Hillery ordered the Heparin
drip discontinued before surgery.  After
the surgery was completed, the Heparin drip was not resumed.

          Melinda
was monitored in the intensive care unit after the amputation.  On September 25, while Melinda was still in
the ICU, testing by Dr. McClamroch and Dr. Tripathy showed inadequate
anti-coagulation.  On September 26,
Melinda was extubated.  A test performed
that day again showed inadequate anti-coagulation.  On September 29, 2008, despite a still
inadequate level of anti-coagulation, Dr. McClamroch approved Melinda’s
transfer out of ICU.  Dr. Tripathy also
examined Melinda and ordered her transfer. 
Dr. Murray also ordered Melinda’s transfer.  Approximately one hour after her transfer, a
nurse found Melinda lethargic and unresponsive.  Melinda was resuscitated and reintubated.  However, she had suffered anoxic encephalopathy—brain
damage caused by lack of oxygen.

          Melinda was transferred back to the
ICU.  At that time, she was placed back
on the Heparin drip.  Dr. McClamroch
ordered a test that showed myocardial infarction was not the cause of Melinda’s
respiratory arrest.  Further testing
indicated that there was no significant blood flow to the brain.  Melinda was declared brain dead.  She was extubated on October 6, 2008.  Melinda was transferred for hospice care
where she remained until she died on October 12, 2008.

          The Kyles
brought this health care liability claim against Dr. Tripathy, Dr. Murray, Dr.
McClamroch, Hillery, and the professional associations with which each doctor
was associated.  As required by statute,
the Kyles filed an expert report by Dr. Stephen Goldman.  Hillery moved to dismiss the Kyles’ suit
against him, objecting to the report on the ground that Dr. Goldman, who is a
cardiologist, is not qualified to opine on the standard of care applicable to
Hillery, a general surgeon.  Hillery also
objected that Dr. Goldman’s opinion is conclusory because it does not link the
facts of the case to his conclusion that Hillery’s breach of the standard of
care caused Melinda’s death.  The trial
court denied the motion to dismiss and Hillery appealed.  




 

Standard of Review

          We review a trial court’s ruling on a
motion to dismiss a health care liability lawsuit pursuant to Chapter 74 of the
Texas Civil Practice and Remedies Code under an abuse of discretion standard.  See Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (reviewing dismissal under
predecessor statute, section 13(e) of article 4590i); Runcie v. Foley, 274 S.W.3d 232, 233 (Tex. App.—Houston [1st Dist.]
2008, no pet.).  A trial court abuses its
discretion if it acts in an arbitrary or unreasonable manner without reference
to guiding rules or principles, or if it clearly fails to analyze or apply the
law correctly.  Runcie, 274 S.W.3d at 232. 
In reviewing whether an expert report complies with Chapter 74, we
evaluate whether the report “represents a good-faith effort” to comply with the
statute.  Strom v. Mem’l Hermann Hosp.
Sys., 110 S.W.3d 216, 221 (Tex. App.—Houston [1st Dist.] 2003, pet.
denied).  In making this evaluation, we
must look only at the information contained within the four corners of the
report.  Bowie Mem’l Hosp. v. Wright,
79 S.W.3d 48, 53 (Tex. 2002).

Qualifications

          In
his first issue, Hillery contends that the trial court abused its discretion in
not dismissing the Kyles’ claim because Dr. Goldman is not qualified to offer
an opinion concerning the standard of care in this claim.  

          Section
74.351(r)(5)(A) requires that an expert opining on “whether a physician departed from accepted standards of
medical care” meet the qualifications set forth in section 74.401.  Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A) (West 2011).  Section 74.401(a) provides:

(a)     In a suit involving a health care liability
claim against a physician for injury to or death of a patient, a person may
qualify as an expert witness on the issue of whether the physician departed
from accepted standards of medical care only if the person is a physician who:

 

(1)     is
practicing medicine at the time such testimony is given or was practicing
medicine at the time the claim arose; 

 

(2)     has
knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim; and 

 

(3)     is
qualified on the basis of training or experience to offer an expert opinion
regarding those accepted standards of medical care. 

 

Tex. Civ.
Prac. & Rem. Code Ann. § 74.401(a) (West 2011).  Section 74.401 continues:          

(c)      In determining whether a witness is
qualified on the basis of training or experience, the court shall consider
whether, at the time the claim arose or at the time the testimony is given, the
witness:

 

(1)     is
board certified or has other substantial training or experience in an area of
medical practice relevant to the claim; and 

 

(2)     is
actively practicing medicine in rendering medical care services relevant to the
claim. 

 

Tex. Civ.
Prac. & Rem. Code Ann. § 74.401(c).

          The first
requirement set forth in section 74.401(a) is that Dr. Goldman “is
practicing medicine at the time such testimony is given or was practicing
medicine at the time the claim arose.”  Tex. Civ. Prac. & Rem. Code Ann.
§ 74.401(a)(1).  Hillery does
not challenge this requirement.  

          The second
and third requirements of section 74.401(a) are that Dr. Goldman have “knowledge
of accepted standards of medical care for the diagnosis, care, or treatment of
the illness, injury, or condition involved in the claim” and be “qualified on
the basis of training or experience to offer an expert opinion regarding those
accepted standards of medical care.”  Id. § 74.401(a)(2), (3).  These are the requirements Hillery contends
Dr. Goldman fails to meet.

          Specifically, Hillery argues that Dr. Goldman is not qualified because he
is a cardiologist who is board certified in cardiovascular disease and internal
medicine, but nothing in his report or curriculum vitae shows that he is
qualified to opine on the area of general surgery or below-knee amputation, the
medical care provided by Hillery in this case. 
An expert need not be practicing in the same field as a defendant
in a health care liability claim in order to qualify as an expert.  Rittger
v. Danos, 332 S.W.3d 550, 558 (Tex. App.—Houston [1st Dist.] 2009, no
pet.); Blan v. Ali, 7 S.W.3d 741, 745
(Tex. App.—Houston [14th Dist.] 1999, no pet.). 
Rather the statute requires that the expert have knowledge of the
condition involved in the claim.  Tex. Civ. Prac. & Rem. Code Ann.
§ 74.401(a)(2); Rittger, 332 S.W.3d at 558 (noting focus is not on defendant
doctor’s area of expertise, but on the condition involved in the claim).  The mere fact that Dr. Goldman is not a general surgeon,
therefore, does not necessarily render him unqualified.

          In his report,
Dr. Goldman states that he is familiar with the standards of care relevant to
the condition involved in this claim.  Specifically,
Dr. Goldman states that, as part of his practice, he treats, and has diagnosed
and treated, “patients with conditions similar to those experienced by Melinda
Kyle including coronary artery disease, hypertension, hyperlipidemia, diabetes,
and peripheral vascular disease.”  He
also states that 

[T]here is considerable overlap in my specialty and that
of physicians caring for patients in a critical care setting including
pulmonology, vascular disease and internal medicine.  My area of specialties overlaps the
physicians involved in the care of Melinda Kyle in the diagnosis, treatment and
management of patients with stents. . . . By virtue of my education, training
and experience, I am well familiar with the standards of care applicable to the
diagnosis and treatment of patients like Melinda Kyle with a history of
coronary artery disease, hypertension, hyperlipidemia, diabetes and peripheral
vascular disease who have undergone surgery.

 

          Dr.
Goldman also explains the basics of the cardiovascular system and how blood
clots in the legs may develop.  The risk
of clots is “significantly increased in patients who have suffered a trauma in
the lower extremities such as would occur during a surgical procedure.”  He further elaborates,

The risk of pulmonary embolism and thrombotic
complications following surgery or immobilization has been well-known for
decades.  It is well established that
patients who are unable to move well, who are obese or bedridden, and therefore
have markedly decreased movement in their legs and bodies, should be given some
type of thrombo-embolism prophylaxis. . . . . It has been well established that
administration of anticoagulant medications like Heparin can prevent clots from
forming thereby preventing the development of pulmonary emboli.

 

          Within
the section of his report dealing with Hillery’s alleged breach of the standard
of care, Dr. Goldman also states, 

The standard of care required Robert Hillery, M.D., the
general surgeon attending to Ms. Kyle, to ensure that proper anticoagulation
occurred following surgery.  The standard
of care required Dr. Hillery to order administration of Heparin for Mrs. Kyle
to prevent the formation of pulmonary embolism and thrombotic
complications.  This standard applies to
all of the healthcare providers involved in the care of Mrs. Kyle as the need
for administration [of] Heparin to anti-coagulate a patient following surgery
involving the hip, leg or lower extremities is well known among physicians
practicing surgery, cardiology and internal medicine.

 

          Furthermore,
as stated above, the statute setting forth the qualifications required of an
expert does not focus on the defendant’s specialty but on the condition
involved in the claim.  See Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2);
Rittger, 332 S.W.3d at 558.  Hillery asserts that he was “consulted solely
regarding amputation” and not to provide any other care.  However, in this case, Hillery’s
conduct related to the amputation or general surgery is not the basis of the Kyles’ claim.  Rather,
the basis of the claim and the focus of Dr. Goldman’s report is the failure to
properly anti-coagulate Melinda following the surgery.  The Kyles alleged
that Hillery and the other defendants were negligent
by failing to “properly diagnose and prescribe necessary medications to Melinda
Kyle,” “anticoagulate Melinda Kyle,” “properly
recognize and diagnose the condition of Melinda Kyle, deceased, including, but
not limited to hypercoaguable state,” and “properly
and timely treat Melinda Kyle.”  Hillery does not assert that Dr. Goldman, who is
board-certified in cardiovascular diseases and internal medicine, is not
qualified to offer an opinion on the standard of care relating to the need to
administer anti-coagulation medication following surgery. 

          Because
Dr. Goldman’s report and curriculum vitae demonstrate his knowledge and
experience treating patients in circumstances similar to those that form the
basis of the allegations in this claim, the trial court did not abuse its
discretion in finding Dr. Goldman qualified. 
See Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2); Rittger, 332
S.W.3d at 558 (neurologist qualified to provide expert opinion on standard of
care or breach thereof by emergency room physician where prospective medical
expert had practical knowledge of what is usually and customarily done by
practitioners under similar circumstances); see
also Barber v. Mercer, 303
S.W.3d 786, 795 (Tex. App.—Fort Worth 2009, no pet.) (holding anesthesiologist
qualified to opine on conduct of surgeon in health care liability claim because
anesthesiologist’s report tied his education, training, and experience to the
specific alleged breach—the positioning and padding of a patient during
surgery, not the conduct of the actual operating techniques); Blan, 7 S.W.3d at 746 (condition involved in claim was stroke,
therefore, neurologist qualified as expert although defendants were emergency
room physician and cardiologist).

Adequacy of Report

          In his
second issue, Hillery contends that Dr. Goldman “fails to adequately set forth
the standard of care, breach of the standard of care, and the causal
relationship between the breach and injury” as required by section 74.351 of
the Texas Civil Practice and Remedies Code. 
See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(a). 

A.
     Chapter 74 expert report requirements

          Pursuant to section 74.351,
medical-malpractice plaintiffs must provide each defendant physician and health
care provider with an expert report.  Tex. Civ. Prac. & Rem. Code §
74.351(a).  If a claimant timely
furnishes an expert report, a defendant may file a motion challenging the
report’s adequacy.  Id.  The trial court shall grant the motion only if
it appears, after hearing, that the report does not represent an objective good
faith effort to comply with the statutory definition of an expert report.  See id. § 74.351(l).  The statute defines an
expert report as a written report by an expert that provides, as to each
defendant, a fair summary of the expert’s opinions, as of the date of the
report, regarding: (1) the applicable standards of care; (2) the manner in
which the care rendered failed to meet the standards; and (3) the causal
relationship between that failure and the injury, harm, or damages
claimed.  See id. § 74.351(r)(6); Gray v. CHCA Bayshore, L.P., 189 S.W.3d
855, 858-59 (Tex. App.—Houston [1st
Dist.] 2006, no pet.).

          Although the report need not marshal
all the plaintiff’s proof, it must include the expert’s opinions on the three
statutory elements—standard of care, breach, and causation.  See Palacios, 46 S.W.3d at 878; Gray,
189 S.W.3d at 859.  In detailing these
elements, the report must provide enough information to fulfill two purposes:
first, it must inform the defendant of the specific conduct the plaintiff has
called into question, and, second, it must provide a basis for the trial court
to conclude that the claims have merit.  Scoresby v. Santillan, 346 S.W.3d 546,
556 (Tex. 2011) (citing Palacios, 46 S.W.3d at 879).  A report that merely states the expert’s
conclusions as to the standard of care, breach, and causation does not fulfill
these two purposes.  Id. 
“‘[T]he expert must explain the basis of his statements to link his
conclusions to the facts.’”  Wright,
79 S.W.3d at 52 (quoting Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex.
1999)).  Furthermore, in assessing the
report’s sufficiency, the trial court may not draw any inferences, and instead
must rely exclusively on the information contained within the report’s four
corners.  See Scoresby, 346 S.W.3d at 556 (citing Palacios,
46 S.W.3d at 878); Wright, 79 S.W.3d at 53.




 

B.      Hillery’s objection

          Hillery’s objection to Dr. Goldman’s report in the trial
court stated, in its entirety:

Dr. Goldman’s report is inadequate because it is
conclusory and fails to provide any factual support for the opinion expressed
within.  Dr. Goldman states that
myocardial infarction was ruled out as the cause of Mrs. Kyle’s arrest.  However, Dr. Goldman fails to provide any
factual support for his conclusion that Mrs. Kyle developed blood clots and
pulmonary emboli that were the cause of her respiratory arrest as a result of
failure [t]o provide appropriate post operative drugs.

 

Because Hillery objected only on
the grounds that the report was conclusory concerning the element of causation,
and did not mention the elements of standard of care or breach, we do not
address that portion of Hillery’s issue concerning standard of care and
breach.  See Tex. R. App. P.
33.1(a); Hawkins v. Herrera, 296 S.W.3d 366, 370 (Tex. App.—Houston
[14th Dist.] 2009, no pet.) (refusing to address
objections by defendant physician who did not raise objections in trial court);
see also Plemons v. Harris, No. 02-08-00326-CV, 2009 WL 51290,
*3 (Tex. App.—Fort Worth Jan.8, 2009, no pet.) (mem. op.) (holding
objection to expert report made in trial court must comport with complaint
asserted on appeal);
Williams v. Mora, 264
S.W.3d 888, 891(Tex. App.—Waco 2008, no pet.) (holding
that when defendant’s only timely filed objections to expert report were that
two statements were speculative, defendant waived all other objections).




 

C.      Adequacy of report concerning causation

          As set forth above, Hillery’s
objection to the adequacy of Dr. Goldman’s report is that “Dr. Goldman
fails to provide any factual support for his conclusion that Mrs. Kyle
developed blood clots and pulmonary emboli that were the cause of her
respiratory arrest as a result of failure [t]o provide appropriate post operative drugs.” 
An expert
report must include a fair summary of the causal relationship between the
defendant’s failure to meet the appropriate standard of care and the injury,
harm, or damages claimed.  Tex. Civ. Prac. & Rem. Code Ann.
§ 74.351(r)(6).  An expert cannot
merely state his conclusions or “provide insight” about the plaintiffs’ claims,
but must instead “explain the basis of his statements to link his conclusions
to the facts.”  Wright, 79 S.W.3d at 52.  In
explaining causation, the report must explain how the physician’s conduct
caused the plaintiff’s injuries.  Id. at 53. 

          Dr. Goldman’s
report concerning causation is not conclusory. 
As discussed above, Dr. Goldman explains the functioning of the
cardiovascular system, including how decreased physical movement causes a
patient to be more prone to clotting, and how formation of clots causes
inadequate oxygenation, respiratory arrest, and brain injury.  He also describes and explains the risk
factors for developing clots and pulmonary emboli, many of which existed in
Melinda’s case, predisposing her to their development:  

Melinda Kyle had multiple risk factors that predisposed
her to the development of blood clots and pulmonary emboli.  Ms. Kyle was obese, had heart disease,
peripheral vascular disease and was immobile. 
Ms. Kyle had also just undergone a below knee amputation, a procedure
that is in itself a risk factor for development of pulmonary emboli.  Ms. Kyle should have been placed back upon
Heparin following this surgery.  In
reasonable medical probability, had the Heparin drop been resumed for Ms. Kyle
following her amputation surgery, she would not have developed the blood clots
and pulmonary emboli that were, in all probability, the cause of her
respiratory arrest on September 29, 2008.  Ms. Kyle would not have suffered the
respiratory arrest on September 29, 2008 if Heparin had been reinstituted and
would not have sustained the anoxic brain injury caused by her arrest.

 

          Concerning
Hillery’s conduct, Dr. Goldman states:

The standard of care required Robert Hillery, M.D., the
general surgeon attending to Ms. Kyle, to ensure that proper anticoagulation
occurred following surgery.  The standard
of care required Dr. Hillery to order administration of Heparin for Ms. Kyle to
prevent the formation of pulmonary embolism and thrombotic complications.  This standard applies to all of the health
care providers involved in the care of Ms. Kyle as the need for administration
Heparin to anti-coagulate a patient following surgery involving the hip, leg or
lower extremities is well known among physicians practicing surgery, cardiology
and internal medicine.  Ms. Kyle was a
patient with multiple risk factors for the development of pulmonary emboli
notably including surgery on the leg which is itself a risk factor sufficient
to warrant administration of Heparin prophylactically following surgery.  For Ms. Kyle, a patient with multiple risk
factors that placed her at an even greater risk for the development of
pulmonary emboli, administration of Heparin was essential to prevent formation
of blood clots.  By failing to order the
Heparin resumed and failing to ensure that Ms. Kyle was receiving Heparin
following her surgery, Dr. Hillery breached and violated the standard of care.
In reasonable medical probability, if Dr. Hillery had met the standard of care
and ordered Heparin following surgery, Heparin would have been resumed in Ms.
Kyle and she would not have developed the pulmonary emboli that caused her
respiratory arrest and anoxic brain injury and she would have survived her hospitalization.

 

          In the
“Conclusion” section of the report, Dr. Goldman summarizes:

Ms. Kyle had several strong and obvious risk factors for
pulmonary emboli yet she was not placed back on Heparin following her below
knee amputation.  This was below the standard
of care for all of the physicians attending to Ms. Kyle. The failure to resume Heparin
following her surgery, in reasonable medical probability, caused the formation
of blood clots that blocked the flow of oxygen and caused her to suffer a
respiratory arrest on September 29, 2008.

 

          Dr. Goldman
does more than just state his conclusions or provide insight regarding the Kyle’s
claims.  See Wright, 79 S.W.3d at 52.  He
explains the medical causes of the formation of clots, including conditions
that increase the risk, and that these risks are well-known.  He identifies Melinda as having several of
these risk factors, including a trauma in the form of a surgical amputation of
her leg below the knee.  He explains that
treatment using a drug such as Heparin is well-established to help prevent
clots from forming and that the standard of care required the defendants,
including Hillery, to administer Heparin following surgery.  He explains that the test ordered by other
defendants ruled out a myocardial infarction. 
And, finally, he opines that the likely cause of Melinda’s death was the
development of blood clots and pulmonary emboli and that she would not have
developed the clots and pulmonary emboli had the Heparin been resumed following
the amputation surgery.  We conclude that
this is a fair summary of the causal relationship between Hillery’s failure to
meet the appropriate standard of care and the injury, harm, or damages claimed.  See Manor
Care Health Servs., Inc. v. Ragan, 187 S.W.3d 556, 564 (Tex. App.—Houston
[14th Dist.] 2006, pet. granted, judgment vacated w.r.m.) (concluding report
adequate concerning causation where report stated that administration of
anticoagulant medication was necessary to prevent pulmonary emboli and that as
result of failure to administer drugs patient probably suffered pulmonary
emboli and consequently died); cf. Shenoy v. Jean, No. 01-10-01116-CV, 2011 WL 6938538, at *7 (Tex.
App.—Houston [1st Dist.] Dec. 29, 2011, no pet. h.) (mem op.) (holding report
inadequate concerning causation because it failed to link decedent’s pre-existing
conditions to an increased risk for the injury involved in that claim).

          In his
appellate brief, Hillery also argues that Dr. Goldman’s opinion is speculative
because he “fails to offer any factual data, clinical, radiological and the
like[,] to support his assumption that blood clots and pulmonary emboli formed
which caused Ms. Kyle’s respiratory arrest. 
There are a multitude of causes for respiratory arrest for a 5-day
postoperative patient.”  To the extent
this is an argument, distinct from the one discussed above, that Dr. Goldman
did not rule out all possible causes of death, we overrule it.  See
Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace, 278
S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.) (“Nothing in section 74.351
suggests the preliminary report is required to rule out every possible cause of
the injury, harm, or damages claimed, especially given that section 74.351(s)
limits discovery before a medical expert’s report is filed.”); see also Methodist
Hosp. v. Shepherd-Sherman, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.]
2009, no pet.) (whether expert’s opinion is correct or not is issue for summary
judgment, not Chapter 74 motion to dismiss); Manor Care Health Servs., Inc., 187 S.W.3d at 564 (report stating failure
to administer anticoagulant drugs probably caused pulmonary emboli that caused
death sufficient statement of causation).

Conclusion

          We affirm the order of the trial
court.

 

 

                                                                   Rebeca
Huddle

                                                                   Justice


 

Panel consists of Chief Justice Radack and Justices
Jennings and Huddle.